CHAPMAN GLEN LIMITED, PETITIONER *v*. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29527–07L, 27479–09.          Filed May 28, 2013.

In 1998, P was a foreign insurance company that elected under I.R.C. sec. 953(d) to be treated as a domestic corporation for U.S. Federal income tax purposes. G signed the election in G's reported capacity as P's secretary. P also applied for and was granted tax-exempt status as an insurance company effective Jan. 1, 1998. For 2003, P filed a Form 990, Return of Organization Exempt From Income Tax, that was not signed by one of P's officers. In 2009, three years after P consented to R's revocation of P's tax-exempt status effective Jan. 1, 2002, R determined that (1) P's election was terminated in 2002 because P was not an insurance company in that year and (2) P was therefore deemed under I.R.C. secs. 354, 367, and 953(d)(5) to have sold its assets on Jan. 1, 2003, in a taxable transaction. P's primary asset on Jan. 1, 2003, was its investment in a disregarded entity (E) that owned various pieces of real property. *Held*: The three-year period of limitations under I.R.C. sec. 6501(a) remains open as to 2003 because P's Form 990 was not a valid return in that it was not signed by one of P's corporate officers. *Held*, *further*, P properly elected under I.R.C. sec. 953(d) to be treated as a domestic corporation, and the termination of that election in 2002 resulted in P's making a taxable exchange under I.R.C. secs. 354, 367, and 953(d)(5) during a one-day taxable year commencing and ending on Jan. 1, 2003. *Held*, *further*, E's real property is included in that taxable exchange, and the fair market value of the real property is determined. *Held*,

294

*further*, P's gross income does not include amounts that R determined were "insurance premiums", and R may not for the first time in R's posttrial opening brief recharacterize the premiums as a different type of taxable income.

*Vicken Abajian* and *Gary Michael Slavett*, for petitioner.
*Najah J. Shariff*, *James C. Hughes*, and *Michael K. Park*, for respondent.

WHERRY, *Judge*: These cases are consolidated for purposes of trial, briefing, and opinion. Petitioner petitioned the Court in docket No. 29527–07L to review the Internal Revenue Service (IRS) Office of Appeals' determination sustaining respondent's proposed levy on petitioner's property to collect $66,539 in additions to tax for 2004. The additions to tax relate to respondent's determination that petitioner failed to timely file Forms 990, Return of Organization Exempt From Income Tax, and 990–T, Exempt Organization Business Income Tax Return (and proxy tax under section 6033(e)), for 2004 and failed to timely pay the related tax.[1] The parties' only dispute remaining from this petition is a computational adjustment that turns on the amount of the deficiency for 2004.

Petitioner petitioned the Court in docket No. 27479–09 to redetermine respondent's determination of the following deficiencies and additions to tax under section 6655:

| Taxable year | Deficiency | Addition to tax sec. 6655 |
|---|---|---|
| 2002 | $43,719 | -0- |
| Jan. 1–Jan. 1, 2003 | 10,130,454 | -0- |
| Jan. 2–Dec. 31, 2003 | 113,181 | $3,278 |
| 2004 | 111,696 | 3,191 |

Respondent alleged in an amendment to answer that the fair market value of real property underlying the deficiency for the one-day taxable year was $36,589,000 instead of $28,943,229 as determined in the notice of deficiency and that the deficiency for that year is therefore $12,806,452

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended and in effect for the applicable years (Code), Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the nearest dollar.

instead of $10,130,454.[2] Respondent asserts in respondent's opening brief that recent concessions put the applicable value of the real property at $34,607,500. Petitioner argues that the fair market value of the real property is $13,711,775.

Following concessions (including petitioner's concessions that it is not an insurance company and that it does not qualify as a tax-exempt organization under section 501(c)(15) as of January 1, 2002), we are left to decide the following issues:

1. whether respondent issued the deficiency notice to petitioner before the three-year period of limitations of section 6501(a) expired as to 2003;

2. whether petitioner properly elected to be treated as a domestic corporation under section 953(d);

3. whether the subsequent termination of petitioner's section 953(d) election resulted in a taxable exchange under sections 354, 367, and 953(d)(5) during the one-day taxable year in 2003;

4. whether the real property that Enniss Family Realty I, L.L.C. (EFR), owned was included in that taxable exchange;

5. whether the fair market value of the real property at the time of the exchange on January 1, 2003 (valuation date), was $34,607,500 as respondent asserts; and

6. whether petitioner's gross income for the respective taxable years includes "insurance premiums" of $128,584, $882, $299,178, and $298,000.

FINDINGS OF FACT

I. *Preliminaries*

The parties submitted stipulated facts and exhibits. We incorporate the stipulated facts and exhibits herein.[3] Peti-

---

[2] Most currently, on the basis of certain concessions that respondent made after his amendment to answer, respondent alleged in his pretrial memorandum that the deficiency for the one-day taxable year is $12,693,052.

[3] Petitioner objected on grounds of relevancy to the admission into evidence of Exhibits 45–J, 46–J, and 47–J. The Court reserved ruling on those objections at trial. We now overrule the objections and admit the exhibits into evidence. *See* Fed. R. Evid. 401 (stating that evidence is relevant if it tends to make the existence of any fact or consequence more or less probable).

tioner's principal office was in Lakeside, California, when its petitions were filed.

Petitioner was formed in the British Virgin Islands as a private international business company on August 29, 1996. It filed Forms 990 for 2002, 2003, and 2004 (as well as for earlier years). Later, in April 2006, petitioner submitted Forms 1120–F, U.S. Income Tax Return of a Foreign Corporation, for 2002 and 2003 to the IRS. The IRS did not accept those Forms 1120–F.

## II. *Petitioner*

### A. *Background*

Petitioner was formed primarily to operate as an insurance (including captive insurance and reinsurance) company and to own, develop, and deal in real property, securities, and personal property. On January 8, 1998, its initial director resolved that all of petitioner's stock be issued to Caesar Cavaricci and that Adam Devone and Bruce Molnar be appointed as petitioner's directors. The initial director also resolved that its contemporaneously tendered resignation as petitioner's initial director was accepted.

### B. *Section 953(d) Election*

On or about November 16, 1998, petitioner delivered to the IRS a "Foreign Insurance Company Election Under Section 953(d)" (section 953(d) election), stating that petitioner was electing under section 953(d) to be treated as a domestic corporation for U.S. tax purposes effective the first day of petitioner's taxable year commencing December 27, 1997. Deanna S. Gilpin signed the election on November 16, 1998, in her reported capacity as petitioner's secretary and under penalty of perjury that the statements therein were true and complete to the best of her knowledge and belief. On or about March 20, 2000, petitioner submitted to the IRS a Form 2848, Power of Attorney and Declaration of Representative, designating Mr. Molnar, Mr. Cavaricci, and David B. Liptz (an associate of Mr. Molnar's) as petitioner's authorized representatives regarding the section 953(d) election and other stated matters, as each applied to petitioner's Federal income tax for 1996 through 2000.

III. *Enniss Family*

A. *Family Members*

The Enniss family (as relevant here) has eight members. Arnold Reid Enniss (Reid Enniss) and his wife (now deceased), Delpha Enniss, are two of the members. Their children are the other six members. The children's names are Chad Enniss, Wade Enniss, Blake Enniss, Carolyn Sandoval, Kelly Kufa, and Eric Enniss.

B. *Enniss Family Business*

The Enniss family has owned and operated a sand mine or quarry through various entities for over five decades. The related business mines or dredges sand, topsoil, and other dirt products (collectively, sand) mainly (if not solely) from riverbeds and markets and sells the mined sand. The Enniss family also for many years has through various entities owned and operated a general engineering and general building contracting business and a steel fabrication and erection, construction trucking, demolition, and grading business. Each member of the Enniss family is involved in the family businesses.

The Enniss family began operating the sand mine in the early 1970s through their controlled corporation, Enniss Enterprises, Inc. In 1987, Enniss Enterprises, Inc., applied for a major use permit (MUP) with respect to the sand mine. The sand mine was in Lakeside, and a significant portion of the property was on the San Vicente Creek riverplain. On April 5, 1990, the San Diego County Planning and Environmental Review Board approved the MUP, allowing Enniss Enterprises, Inc., for a 15-year period, to conduct a mining operation that excavated and removed 2.2 million cubic yards of sand and gravel and conducted related screening. [4] Eventually, from January 2002 through 2004, the sand mine business was owned and operated by Enniss, Inc. (another entity that the Enniss family controlled as discussed below). The Enniss family, through their various entities, excavated approximately 1,708,960 tons of sand (approximately

---

[4] One cubic yard of sand generally weighs 1½ tons.

1,139,307 cubic yards) from the sand mine from 1990 to 2001.[5]

## IV. *Lawsuit*

In February 1998, an employee of the Enniss family business was seriously injured while at work, and he sued some or all of the Enniss family members both personally and through their business. The Enniss family retained various attorneys to defend them in the lawsuit and to structure the family's finances to protect their assets. The Enniss family asked Earl Husted, an attorney, for advice on asset protection and estate planning. Mr. Husted recommended that the Enniss family contact another attorney, Fred Turner, and Mr. Molnar, a certified public accountant (C.P.A.). Mr. Turner and Mr. Molnar coowned a business in Orange County, California, named Global Advisors.

## V. *Petitioner's Application for Tax Exemption*

On June 17, 1999, petitioner filed with the IRS a Form 1024, Application for Recognition of Exemption Under Section 501(a), seeking tax-exempt status under section 501(c)(15) as a tax-exempt insurance company. The application stated that petitioner was a licensed property and casualty insurance company which had entered into reinsurance contracts and anticipated continuing that line of business.

---

[5] The parties stipulated that Exhibit 74–J contains the Mining Operation Annual Reports for Enniss Enterprises, Inc., Enniss, Inc., and Commercial Conservancy Number One (another Enniss family controlled entity d.b.a. Enniss Enterprises) for 1991 through 2001 and 2003 through 2009. Respondent in his opening brief cited this exhibit and proposed that the Court find that approximately 1,708,960 tons of sand were excavated between 1991 and 2001. Petitioner in its answering brief admitted this proposed finding. We find in Exhibit 74–J, however, that the first annual report, while signed in 1991, actually reports sand that was excavated in 1990 and this sand is included in the 1,708,960 tons. We therefore find contrary to the stipulation that the sand was excavated between 1990 and 2001. *See Gerdau MacSteel, Inc. v. Commissioner*, 139 T.C. 67, 144 n.55 (2012) (stating that, where justice requires, the Court may disregard a stipulation which is clearly contrary to the record). We also note that the annual report for 1995 lists a number that appears to be 140,000 but could be 190,000. Respondent in his proposed finding of fact has reflected that number as 190,000, and we do the same given petitioner's agreement with respondent's proposed finding.

The application stated that petitioner did not insure related parties or reinsure any related-party insurance. The application listed Mr. Cavaricci as petitioner's president and director and Vince Ambrose as petitioner's secretary and director. On or about September 15, 1999, petitioner submitted to the IRS a Form 2848 authorizing Mr. Molnar (as a C.P.A.), Mr. Cavaricci (as an officer of petitioner), and Ms. Gilpin (as a full-time employee of petitioner) to represent petitioner as to the application and to petitioner's Forms 990, as each related to petitioner's Federal income tax for 1996 through 1999.

On November 24, 1999, the IRS (through the Chief of Exempt Organizations Technical Branch 3) notified petitioner by letter that the IRS had considered the application and determined solely on the basis of the information furnished therewith that petitioner was tax exempt as an organization described in section 501(c)(15), effective January 1, 1998. The IRS noted in the letter that petitioner had filed its section 953(d) election. Petitioner subsequently filed its Forms 990 for 2002, 2003, and 2004 consistent with the status of a domestic tax-exempt entity for Federal tax purposes.

## VI. *Enniss Family's Asset Protection and Estate Planning Strategies*

During or before 2001, Mr. Turner and Mr. Molnar met with the Enniss family at the family's office in Lakeside. The attendees discussed the previously mentioned lawsuit (which was then pending), the Enniss family's business operations, and the possible benefits of a captive insurance company.[6] Mr. Turner and Mr. Molnar suggested that the Enniss family consider using a captive insurance arrangement to protect

---

[6] As the Court explained in *Hosp. Corp. of Am. v. Commissioner*, T.C. Memo. 1997–482:

The insurance laws of some States provide for a category of limited purpose insurance companies, popularly called captive insurance companies or captive insurers. Captive insurance company statutes generally apply to companies that insure on a direct basis only the risks of companies related by ownership to the insurer. Because pure captive insurance companies typically are formed for the purpose of insuring the risks of related companies, the function of risk selection, in essence, is attained at the onset.

their assets. Later that year, the Enniss family decided to avail themselves of the proffered benefits of a captive insurance company. Global Advisors recommended that the Enniss family purchase petitioner, an already-existing captive insurance company that the then owner wanted to sell, in order to avoid the costs of forming a new entity and to save money on the venture. Petitioner's stock was then wholly owned by Mr. Cavaricci.

VII. *Enniss Family Purchases Petitioner Through BC Investments, L.L.C.*

From August through December 2001, the Enniss family caused a series of transactions to be consummated to effect the family's purchase of all petitioner stock from Mr. Cavaricci. Through the transactions, petitioner first relinquished all of its assets and liabilities and then Mr. Cavaricci sold his petitioner stock to BC Investments, L.L.C., for $10,000.[7] At that time, each member of the Enniss family owned a 12.5% interest in BC Investments, L.L.C., and the IRS had issued the Enniss family a Federal identification number for the company.

BC Investments, L.L.C., continued to be petitioner's sole owner through 2004. BC Investments, L.L.C., did not file a Form 1065, U.S. Return of Partnership Income, or a Form 1120, U.S. Corporation Income Tax Return, for any of the years 2001 through 2004.

---

[7] The parties have stipulated that Exhibit 21–J is a stock purchase agreement between Mr. Cavaricci and BC Investments, L.L.C., dated December 11, 2001, and that Exhibit 23–J is a copy of the Form 990 that petitioner filed for 2002. The former exhibit states that BC Investments, L.L.C., is a Nevis limited liability company, and the latter exhibit states that BC Investments, L.L.C., is a California general partnership. The parties also have stipulated that petitioner has not stipulated that BC Investments, L.L.C., is either a Nevis limited liability company or a California general partnership. The record fails to indicate whether BC Investments, L.L.C., is a Nevis limited liability company, a California general partnership, or something else, and we need not and do not make a finding as to that matter.

VIII. *Enniss, Inc., and EFR*

A. *Overview*

Mr. Turner and Mr. Molnar wanted to establish an entity (eventually, Enniss, Inc.) to operate the Enniss family's general engineering and general building contracting business and another entity (eventually, EFR) to hold the Enniss family's real property. Mr. Turner and Mr. Molnar wanted petitioner to provide insurance coverage for Enniss, Inc., and for EFR.

B. *EFR*

1. *Background*

Effective December 31, 2001, the Enniss family formed EFR as a California limited liability company to hold and to manage their real property. Incident to this formation, each Enniss family member contributed $125 to EFR in exchange for a 12.5% interest in EFR. Each Enniss family member later transferred his or her real property to EFR. From 2002 through 2004, EFR owned various pieces of real property and operated primarily as a real property management company. Reid Enniss was EFR's general manager, and members of the Enniss family performed in the United States activities related to the management of EFR's real properties. EFR did not file a Form 1065 (or a Form 1120) for any of the years 2001 through 2004.

2. *Transfers*

On or about January 1, 2002, the Enniss family contributed their membership interests in EFR to BC Investments, L.L.C.[8] BC Investments, L.L.C., then contributed those interests to petitioner. As of January 1, 2002, petitioner owned EFR as a "Disregarded Entity" for Federal tax purposes.[9] Petitioner has treated EFR as its wholly owned disregarded entity since January 1, 2002.

---

[8] While Ms. Sandoval testified that she never transferred her membership interest in EFR to BC Investments, L.L.C., that testimony is disproved by the credible evidence in the record.

[9] *See* secs. 301.7701–1(a)(4) (providing that "certain organizations that have a single owner can choose to be recognized or disregarded as entities separate from their owners"), 301.7701–3(b)(1) (providing that a domestic

### 3. *Specific Real Property Holdings*

During 2002 and 2003, EFR owned the following nine groups of property, as identified by Eichel, Inc., real estate analysis and appraisers, with the following corresponding parcels: [10]

| Property group | Parcel | Parcel No. | Approximate acreage | Zoning |
|---|---|---|---|---|
| 1—Sand mine | | | | |
| | A: Lot 210 | 375–040–01–00 | 18.38 | A70 |
| | B: Lot 209 | 375–040–18–00 | 14.50 | A70 |
| | C: Lot 206 | 375–040–15–00 | 9.90 | A70 |
| | D: Lot 203 | 375–040–14–00 | 10.15 | A70 |
| | E: Lot 215 | 375–040–33–00 | 17.70 | M58 |
| | | | 70.63 | |
| 2—Rock quarry | | | | |
| | F: Highway 67 | 326–050–11–00 | 7.53 | M58 |
| 3—Vacant industrial land | | | | |
| | G: Lot 212 | 375–041–41–00 | 2.86 | M58 |
| | H: | 375–041–44–00 | 4.70 | M58 |
| | I: Lot 1 | 375–190–01–00 | 0.88 | M58 |
| | | | 8.44 | |
| 4—Vacant industrial land | | | | |
| | J: Lot 2 | 375–190–02–00 | 1.05 | M58/A70 |
| | K: Lot 4 | 375–190–04–00 | 2.37 | M58/A70 |
| | L: Lot 10 | 375–190–10–00 | 1.14 | M58 |
| | M: Lot 11 | 375–190–11–00 | 1.29 | M58 |
| | N: Lot 12 | 375–190–12–00 | 3.93 | M58 |
| | | | 9.78 | |
| 5—Vacant multifamily site | | | | |
| | O: Graves | 384–120–63–00 | 22.23 | HL |
| | P: | 378–120–62–00 | 6.25 | HL |
| | Q: | 378–120–31–00 | 2.99 | HL |
| | | | 31.47 | |

entity is "Disregarded as an entity separate from its owner if it has a single owner" and does not elect otherwise), Proced. & Admin. Regs.

[10] For part of this time, EFR also owned lot 8, parcel No. 375–190–08–00, in addition to the listed parcels. That 1.08-acre parcel was sold on October 8, 2002, for $635,000.

| Property group | Parcel | Parcel No. | Approximate acreage | Zoning |
|---|---|---|---|---|
| 6—Single-family dwelling | | | | |
| | R: Lot 17 | 379–060–21–00 | 2.76 | A70 |
| 7—Single-family dwelling | | | | |
| | S: Via Viejas | 404–300–03–00 | 2.5 | A70 |
| 8—Vacant single-family lots | | | | |
| | T: Utah | 27–02–426–002 | 0.13 | R |
| | U: Utah | 27–02–426–005 | 0.16 | R |
| | | | 0.29 | |
| 9—Vacant residential site | | | | |
| | V: Ramona | 287–031–26–00 | 39.24 | A72 |

A70 zoning allows limited agricultural and commercial uses related to agricultural or civic uses. M58 zoning reflects high-impact industrial use (e.g., steel fabrication and contractors' yards), and vacant land with M58 zoning provides an additional advantage to certain businesses in that it allows for unenclosed commercial and industrial uses having potential nuisance characteristics. HL zoning allows for limited residential development.

4. *Description of Properties*

a. *Property Group 1*

Property group 1 is the Enniss family's sand mine plant at the corner of Vigilante Road and Moreno Avenue. As of the valuation date, parcels A through D were used to mine sand and topsoil, and parcel E, which had a few small buildings on it, was used primarily as the sand mine's business office and for storage. The highest and best use of property group 1 as of the valuation date was continued mining of the property's mineral resources. The highest and best use for the property after the mineral resources are depleted is industrial development or outdoor storage.

b. *Property Group 2*

Property group 2 is vacant land north of Vigilante Road, on State Highway 67. This property's use is limited to source material for a rock quarry operation. The parties agree that

the fair market value of property group 2 as of the valuation date was $500,000.

c. *Property Groups 3 and 4*

Property groups 3 and 4 (which the parties refer to as the Vigilante Industrial Lots) are vacant industrial lots across the street from each other on Vigilante Road between property group 1 and State Highway 67. The eight underlying parcels are irregular in shape, they are accessible by way of Vigilante Road, and they have available water, sewer, and electricity service.

As of the valuation date, property groups 3 and 4 were used for open surface and minor office buildings. The highest and best use for these property groups was industrial usage, open storage, or outdoor manufacturing.

d. *Property Group 5*

Property group 5 (which the parties refer to as the Graves Avenue Properties) is undeveloped Rattlesnake Mountain hillside land in Santee, California, approximately five miles south of property groups 3 and 4. Property group 5 is located at the terminus of Graves Avenue.

The Enniss family bought property group 5 for $300,000 in 1998. The previous owner had mined granite on the property, leaving a decomposed granite pit with several hundred thousand tons of large boulders weighing from 1 to 30 tons each. The Enniss family purchased property group 5 to resell the boulders for rip rap along the coast of California. Rip rap is the rock revetment that goes along the beach to dissipate the energy from the ocean so that it does not erode the cliffs.

The Enniss family started marketing the boulders as rip rap during the spring of 1999, but a local sheriff ordered them in 2001 to stop their activities on property group 5. The property remained idle until 2002, when a lawyer for a developer, Joel Faucetta, approached the Enniss family to buy the property as part of Mr. Faucetta's efforts to redevelop a surrounding area to the west. Graves Avenue was the proposed development's only access road, and Mr. Faucetta wanted property group 5 to access his proposed development. Santee was backing and spearheading a development of the surrounding area for residential use.

On August 12, 2002, EFR, as optionor, and Faucetta Development Co. (FDC), as optionee, entered into an option agreement that provided FDC, for a term of up to 24 months (or, if earlier, five days after the recordation of the first final subdivision map for the development), with the right to purchase property group 5 for $5 million.[11] FDC paid EFR $1 for the option. If FDC failed to exercise the option, EFR had

[11] The option agreement provided in part:

A. Optionor has offered to grant Optionee an option to purchase its fee title interest in approximately 30 acres (plus or minus) of real property located in the City of Santee, County of San Diego, California * * * on the terms and conditions hereinafter set forth.

B. Optionee desires to acquire an option to purchase the Property under the terms and conditions hereinafter set forth.

C. Optionee understands and agrees that the Property will be processed for development entitlements with other adjacent property consisting of approximately 275 acres under a joint application for one Master Project.

NOW THEREFORE, in consideration of the payment of $1.00 and the mutual promises contained herein, the parties agree as follows:

1. *Grant of Option*. Optionor hereby grants to Optionee, or its Assignee, the exclusive right and option to purchase the Property upon the terms and conditions and for the purchase price hereinafter set forth.

* * * * * * *

6. *Exercise of Option*. In the event that Optionee, or its Assignee, exercises this Option, such exercise shall be effected by Optionee, or its Assignee, sending written notice to Optionor of the intent to exercise the option. Thereafter, Optionee shall within three (3) business days of the date of the written notice open an escrow to purchase the Property in accordance with the terms provided herein.

In the event that Optionee does not exercise the Option provided for herein, Optionor shall sell to Optionee an easement for ingress and egress over the road across the Property shown on the approved tentative map for the Master Project. In addition, Optionor shall grant Optionee an easement over the land at the entrance of the Master Project, not to exceed one-half acre, in order to erect appropriate entry monumentation for the Master Project. In exchange for the purchase of the easement for the road and the easement for entry monumentation of the Master Project, Optionee shall improve the access road, the entry monumentation area and provide stubbed underground utilities, including sewer, water, electricity and cable to all the approved lots on the Property and pay the sum of Two Million and No/Dollars ($2,000,000) within five (5) business days after the approval of the first final subdivision map for the Master Project.

to sell FDC two easements over property group 5 at a total cost of $2 million and FDC had to make certain improvements to the property. When the option agreement was entered into, Reid Enniss knew that Mr. Faucetta was trying to acquire several surrounding parcels for a larger development. On the valuation date, property group 5 was zoned Hillside Limited, which allowed residential development of approximately seven to nine homes.

On August 8, 2004, FDC notified EFR that FDC was exercising the option to purchase property group 5 on or before September 12, 2004. FDC and EFR eventually agreed on September 20, 2004, to extend the close of the sale and the escrow until April 15, 2005, in exchange for FDC's agreeing to pay EFR an additional $500,000. The option was ultimately assigned to Lennar Homes, a national home builder, which purchased property group 5 on April 15, 2005, for its Sky Ranch development project.

### e. *Property Group 6*

Property group 6 is an older single-family dwelling in Lakeside. The parties agree that the fair market value of property group 6 was $367,500 as of the valuation date.

### f. *Property Group 7*

Property group 7 is a high-end single-family dwelling in Alpine, California. The parties agree that the fair market value of property group 7 was $918,000 as of the valuation date.

### g. *Property Group 8*

Property group 8 is two adjacent single-family lots in Sandy, Utah. The parties agree that the fair market value of property group 8 was $126,000 as of the valuation date.

### h. *Property Group 9*

Property Group 9 is vacant land in a remote rural area of northeast San Diego County. The parties agree that the fair market value of property group 9 was $145,000 as of the valuation date.

### 5. *Leases*

From 2002 through 2004, EFR entered into leasing agreements with various third parties for rental of its properties.

On January 1, 2002, EFR leased parcels A through D of property group 1 to Enniss, Inc., in exchange for a royalty payment of $2 per ton of material processed and sold from those parcels.

## C. *Enniss, Inc.*

Mr. Husted incorporated Enniss, Inc., in the State of California on or about December 19, 2001. Enniss, Inc., is involved in general engineering, general building contracting, steel fabrication and erection, construction trucking, demolition, and grading and operates the Enniss family's sand mine. Enniss, Inc., is controlled by the Enniss family.

Since January 1, 2002 (including on the valuation date), Enniss, Inc., has operated the sand mine on parcels A through D pursuant to its lease agreement with EFR. The agreement provided that Enniss, Inc., could use the property as its sand mining operation, materials division office, and maintenance facilities. The parties to that lease also entered into a second lease agreement on the same date under which Enniss, Inc., used one acre and 4,800 feet of office space on parcel E. As of the valuation date, Enniss, Inc., used parcel E as the site for its offices and storage and maintenance sheds, as well as a yard area for the stacking and processing of materials.[12]

## IX. *Reclamation Plan*

### A. *Background*

The Surface Mining and Reclamation Act of 1975 (SMARA), Cal. Pub. Res. secs. 2710 through 2796 (West 2001 & Supp. 2013), required that the sand mine have an approved reclamation plan that details how the mine would be reclaimed to a usable condition in a manner that prevented or minimized adverse environmental impacts and eliminated residual hazard to the public health and safety. The reclamation plan for property group 1, as in effect on the valuation date, generally required that the operator of the sand mine reclaim the sand mine after the mining was complete. Specifically, as of that time, fill had to be transported to the pits on the property to construct various stable and

---

[12] Minimal mining also occurred on parcel E.

compacted pads. The reclamation plan also required that a drainage channel be constructed through the two southern parcels of the site to carry water from the lake to the existing San Vicente Creek south of the site.

The SMARA also required a financial assurance mechanism (e.g., a bond or a letter of credit) to guarantee that the costs associated with reclaiming the land in accordance with the approved reclamation plan would be paid if the mine operator became financially insolvent. Regardless of the mine operator's financial condition, the land owner is ultimately responsible for the cost of reclamation. As of the valuation date, no financial assurance was in place to guarantee that reclamation of property group 1 would occur. Property group 1, once in the 1990s, had a $40,000 bond but the bond expired before the valuation date.

B. *Fill*

The primary reclamation activity is obtaining fill to refill the mined pits.[13] Sand mine owners and operators in San Diego County sometimes purchase fill, especially when the fill is of a specialized material. Other times, the owners and operators receive free fill from construction debris and other off-site sources, or charge a $2 to $6 per ton tipping fee to allow companies desiring to dispose of their fill to dump the fill in the mined pits at the sand mines.

As of the valuation date, multiple mining enterprises in the San Diego area used fill for reclamation purposes. Many of these enterprises charged tipping fees for accepting the fill. Development projects in downtown San Diego provided a major source of the fill in San Diego County, and other sites outside of the downtown area did as well. Additional fill sources in the Lakeside area at or around that time included concrete rubble, asphalt rubble, construction overburden, and sand and gravel that was not suitable for processing. During 2002 and 2003, the amount of fill that these areas around the sand mine were capable of generating was projected over five years to comprise between 475,000 and 2 million cubic yards.

---

[13] Other reclamation activities included removing equipment and structures, revegetation, and certain indirect items. The costs of these other activities were relatively minimal in relation to the cost of the fill.

Enniss, Inc.'s nearby neighbor, Hanson Materials (Hanson), had about two million cubic yards of fill dirt at that time sitting in a large pile on the property. The Hanson site was near property group 1 but, inter alia, a 5,700-foot conveyor system would have had to be constructed to transport the fill to property group 1. Baxter owned a parcel of real property between property group 1 and the Hanson site. The owner of property group 1 would need Baxter's consent to build the conveyor on or over Baxter's property. Baxter was a blasting contractor and stored explosives on its land. Other parcels of land also were between the Hanson site and property group 1, and the owner of property group 1 also needed the consent of those property owners to build the conveyor on or over their properties. The Enniss family had no permission from Baxter or from any of the other property owners to run a conveyor over their properties. The Enniss family, however, may have then owned the other properties. [14]

Beginning in 2002, Enniss, Inc., charged companies tipping fees to dump their fill at its sand mine. The relevant data underlying the tipping fees that Enniss, Inc., received in 2002 and 2003 is as follows:

| Year | Fill received (tons) | Tipping fees collected | Average tipping fee per ton |
|------|------|------|------|
| 2002 | 2,769.52 | $84,128 | $30.38 |
| 2003 | 10,483.37 | 144,450 | 13.78 |

## C. *Lakes*

Property group 1 included a northerly lake. As of the valuation date, no sand remained for permissible excavation in that lake. The approved mining depth was generally 35 feet, and the northerly lake had been overexcavated to a depth of at least 40 feet and perhaps as deep as 75 feet. The approved reclamation plan and the MUP called for the area to remain a lake.

---

[14] Although the record is ambiguous, Chad Enniss testified that to construct and to operate the proposed conveyor system Enniss, Inc., would have needed "permission [i.e., an easement or license] from Hanson, Baxter, [and] possibly a couple of the others there on Vigilante Road, but at that time, I think that we owned all of those" other parcels of property.

Property group 1 also included a southerly lake. As of the valuation date, no sand remained for permissible excavation in the southerly lake. The southerly lake had to be filled as part of the reclamation of property group 1.

### D. *Condition of Mine on the Valuation Date*

On the valuation date, property group 1 was in the worst condition it had been in since the Enniss family started mining the property. Few if any conditions of the MUP had been met; little reclamation had taken place; and the property had been mined out of phase, over depth, and too close to the road. In addition, no financial assurance was in place; existing roads were not widened; new roads were not built; and the mines were approximately 60 to 80 feet deep from the surface elevation.

## X. *Ms. Sandoval*

Ms. Sandoval was petitioner's secretary during the subject years. She was in charge of filing and signing petitioner's tax returns.

## XI. *Petitioner's Forms 990 and 990–T*

### A. *Form 990 for 2002*

Petitioner filed its Form 990 for 2002 on or about January 15, 2004. The return lists Chad Enniss as petitioner's president and Ms. Sandoval as petitioner's secretary. The return is signed and dated by Ms. Sandoval, and she also printed her name and title ("Secretary") next to her signature on the line for those items. The return was prepared and also signed by a representative of Molnar and Associates on behalf of that entity in his or her capacity as the return's preparer. The representative's signature is illegible.

The Form 990 for 2002 reports that EFR is a limited liability company that petitioner wholly owned. The return also reports that EFR is a disregarded entity. In addition, the return reports that petitioner received tax-exempt insurance premium revenue of $128,584 during 2002.

B. *Form 990 for 2003*

Petitioner filed its Form 990 for 2003 on or about November 19, 2004. The return lists Chad Enniss as petitioner's president and Ms. Sandoval as petitioner's secretary. The return was prepared and signed by a representative of Molnar and Associates on behalf of that entity in his or her capacity as the return's preparer. The representative's signature is illegible, but it appears to be that of the same individual who signed the Form 990 for 2002 as its preparer. [15] The return was not signed by anyone other than the preparer.

The Form 990 for 2003 reports that EFR is a limited liability company that petitioner wholly owns. The return also reports that EFR is a disregarded entity. The return also reports that petitioner received tax-exempt insurance premiums revenue of $300,000 during 2003.

C. *Form 990 for 2004*

Petitioner filed its Form 990 for 2004 on or about November 21, 2005. The return lists Chad Enniss as petitioner's president and Ms. Sandoval as petitioner's secretary. The return was prepared by J. Douglass Jennings, Jr., on behalf of his professional corporation, and was signed by him in that capacity. The return also was signed and dated by Ms. Sandoval in her capacity as petitioner's secretary, and she also printed her name and title ("Secretary") under her signature on the line for those items.

The Form 990 for 2004 reports that petitioner received tax-exempt insurance premiums revenue of $298,000 during 2004.

D. *Form 990–T for 2004*

Petitioner filed its Form 990–T for 2004 on or about November 15, 2005.

---

[15] While petitioner asks the Court to find that the signature is that of Mr. Molnar, the signature is most likely that of Mr. Liptz.

## XII. *Respondent's Examination*

### A. *Tax-Exempt Status*

During or about June 2005, the IRS (through its Tax-Exempt and Government Entities Division) began an examination for petitioner's 2002 and 2003 taxable years and most specifically petitioner's tax-exempt status under section 501(c)(15). The IRS ultimately determined that petitioner was not an insurance company and did not qualify as a tax-exempt organization described in section 501(c)(15) as of January 1, 2002. Petitioner eventually agreed with this determination. On April 12, 2006, Ms. Sandoval, as petitioner's secretary and treasurer, signed Form 6018–A, Consent to Proposed Action, consenting to the IRS's revocation of petitioner's tax exemption as of January 1, 2002.

### B. *Income Tax*

During or around November 2005, the IRS (through its Large and Mid-Size Business Division) began an examination for petitioner's income tax liabilities for 2002 and 2003. The examination was later expanded to include 2004.

Respondent used substitute for return procedures to determine petitioner's income tax liability for each subject year. Respondent determined that the termination of petitioner's section 953(d) election caused petitioner to be a taxable corporation which sold its assets to a controlled foreign corporation on January 1, 2003 (which, respondent determined, was a one-day taxable year in and of itself). Respondent bifurcated petitioner's 2003 taxable year into the one-day taxable year beginning and ended on January 1, 2003, and a second taxable year consisting of the remainder of 2003. For the one-day taxable year, respondent determined petitioner's income tax liability in part on the basis of the deemed sale.

## XIII. *Notice of Deficiency*

On August 5, 2009, respondent issued petitioner the notice of deficiency underlying these cases.

OPINION

I. *Burden of Proof*

With one exception, petitioner bears the burden of proving that respondent's determination of the deficiencies set forth in the deficiency notice is incorrect. *See* Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Baxter v. Commissioner*, 816 F.2d 493, 495 (9th Cir. 1987), *aff'g in part, rev'g in part on an issue not relevant here* T.C. Memo. 1985–378. Section 7491(a) sometimes shifts to the Commissioner part or all of the burden of proof where the taxpayer introduces credible evidence of a factual matter, but that section does not apply where a taxpayer fails to satisfy the related requirements. *See, e.g.*, sec. 7491(a)(2)(A), (B), and (C). Petitioner has failed to establish that it meets all of those requirements.

The single exception is that respondent bears the burden of proof as to the fair market value of the real property underlying the deficiency for the one-day taxable year. These cases are appealable to the Court of Appeals for the Ninth Circuit (absent the parties' stipulation to the contrary), and this Court will follow a decision of that court which is "squarely in point". *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Ninth Circuit has indicated, on at least three occasions, that the presumption of correctness that attaches to a notice of deficiency is forfeited where the Commissioner adopts a litigating position different from the valuation stated in a deficiency notice. *See Estate of Mitchell v. Commissioner*, 250 F.3d 696, 701–702 (9th Cir. 2001), *aff'g in part, vacating in part and remanding* 103 T.C. 520 (1994) and T.C. Memo. 1997–461; *Estate of Simplot v. Commissioner*, 249 F.3d 1191, 1193–1194 (9th Cir. 2001), *rev'g and remanding* 112 T.C. 130 (1999); *Morrissey v. Commissioner*, 243 F.3d 1145, 1148–1149 (9th Cir. 2001), *rev'g and remanding Estate of Kaufman v. Commissioner*, T.C. Memo. 1999–119. [16] Respondent's litigating position as to the fair

---

[16] In each of these cases, the Commissioner determined an estate tax deficiency on the basis of an increase in the fair market value over that reported on the estate tax return and later submitted expert reports supporting the Commissioner's concessions that the fair market value was less than that determined in the statutory notice. *See Estate of Mitchell v.*

market value of the real property underlying the deficiency in the one-day taxable year differs from the value stated in the deficiency notice.

## II. *Period of Limitations*

Petitioner argues that the three-year period of limitations of section 6501(a) precludes respondent from assessing any tax for the one-day taxable year. To that end, petitioner asserts, it filed a Form 990 for 2003 that commenced the period of limitations for the one-day taxable year. Respondent argues that the period of limitations for the one-day taxable year never began because, respondent asserts (among other reasons), petitioner did not file a valid Form 990 for any part of 2003. We agree with respondent.

Section 6501(a) generally provides that the Commissioner must assess any income tax for a taxable year within three years after the return was filed. For this purpose, section 6501(g)(2) provides that "[i]f a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization". Section 6033(a)(1) requires, with limited exceptions not applicable here, that every organization exempt from tax under section 501(a) file an annual return listing certain information, and section 1.6033–2(a)(2)(i), Income Tax Regs., generally states that the return shall be filed on Form 990. Section 6062 requires that a corporation's "president, vice-president, treasurer, assistant treasurer, chief accounting officer or any other officer duly authorized so to act" sign the corporation's income tax return. Filing an unsigned form is not the filing of a valid return for purposes of commencing the running of the period of limitations. *See Lucas v. Pilliod Lumber Co.*, 281 U.S. 245 (1930); *Elliott v. Commissioner*, 113 T.C. 125 (1999); *see also Richardson v. Commissioner*, 72 T.C. 818, 823–824 (1979)

---

*Commissioner*, 250 F.3d 696, 698–699 (9th Cir. 2001), *aff'g in part, vacating in part and remanding* 103 T.C. 520 (1994) *and* T.C. Memo. 1997–461; *Estate of Simplot v. Commissioner*, 249 F.3d 1191, 1193–1194 (9th Cir. 2001), *rev'g and remanding* 112 T.C. 130 (1999); *Morrissey v. Commissioner*, 243 F.3d 1145, 1149 (9th Cir. 2001), *rev'g and remanding Estate of Kaufman v. Commissioner*, T.C. Memo. 1999–119.

(and the cases cited thereat). This is true even where the IRS accepts and processes the unsigned return. *See Pilliod Lumber Co.*, 281 U.S. at 249; *Plunkett v. Commissioner*, 118 F.2d 644, 650 (1st Cir. 1941), *aff'g* 41 B.T.A. 700 (1940).

The parties dispute whether petitioner's Form 990 for 2003 that was submitted to the IRS was signed by one of petitioner's officers. Petitioner asserts in its brief that the form was signed by Ms. Sandoval but that neither petitioner nor respondent has been able to produce a copy of the signed form. Petitioner asserts alternatively that the return was signed by Mr. Molnar as a director who was duly authorized to sign the return on petitioner's behalf. We disagree with petitioner on both points. [17]

Exhibit 24–J is a joint exhibit that was entered into evidence through a stipulation that the exhibit "is a true and correct copy of the Form 990 Return of Organization Exempt from Income Tax filed by CGL [petitioner] for tax year 2003." The form bears no signature on the line for the "signature of officer". Nor does it list any date on the corresponding line for the date, or any information on the corresponding line for "Type or print name and title". In the section that is labeled "Paid Preparer's Use Only", a signature was reportedly entered on November 4, 2004, by a preparer who worked for Molnar and Associates. The preparer's signature is illegible, however, and the return does not otherwise identify the preparer. The signature does not appear to be that of either Chad Enniss or Ms. Sandoval, who the return reports are petitioner's only officers. Nor does the return contain any other signatures.

Petitioner asks the Court to find as a fact that Ms. Sandoval signed petitioner's Form 990 for 2003 notwithstanding the fact that Exhibit 24–J contains no such signature and that the parties have stipulated that the exhibit is a true copy of petitioner's Form 990 for 2003. To that end, petitioner invites the Court to minimize the significance of the stipulation by observing that Ms. Sandoval testified at trial that "I think I signed the [2002 through 2004] returns." Ms. Sandoval also testified that "I believe I did" sign peti-

---

[17] Petitioner argues that the term "officer" in sec. 6062 naturally includes a corporation's director even if the director is not also a corporate officer. We need not and do not decide that issue.

tioner's returns for 2002 through 2004. We decline petitioner's invitation to make its desired finding. A stipulation that only one of the parties thereto challenges is generally treated as a conclusive admission to the extent of its terms, and the party is not allowed to qualify, change, or contradict any or all parts of a stipulation unless justice requires. [18] *See* Rule 91(e); *Spencer v. Commissioner*, 110 T.C. 62, 81 (1998); *Modern Am. Life Ins. Co. v. Commissioner*, 92 T.C. 1230, 1249 (1989); *see also Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1547–1548 (9th Cir. 1987), *aff'g* T.C. Memo. 1986–23. We are not persuaded that Ms. Sandoval's equivocal testimony supports a conclusion that justice requires that we disregard any part of the parties' stipulation that Exhibit 24–J "is a true and correct copy of the Form 990 Return of Organization Exempt from Income Tax filed by CGL [petitioner] for tax year 2003".

Nor are we persuaded that the Form 990 which petitioner submitted to respondent for 2003 was appropriately signed by one of petitioner's officers through the preparer's signing of his or her name as the return preparer. The preparer's signature is illegible, as stated above, and the record does not otherwise allow us to definitively find the preparer's identity. Even if we were to assume that the preparer's signature on the Form 990 for 2003 was Mr. Molnar's, an assumption which we do not find as a fact notwithstanding petitioner's request that we do so, our view would stay the same. The preparer's signature on that form is explicitly that of an individual in his or her capacity as the preparer of the return; it is not explicitly that of an officer of petitioner in his or her capacity as such. Contrary to petitioner's suggestion, the fact that the preparer signed his or her name under penalties of perjury, as was required for the corporate officer's signature as well, is not enough to carry the day. We conclude that petitioner did not file a Form 990 for 2003 which commenced

---

[18] We note that the parties' Joint Stipulation of Facts further states "that either party may introduce other and further evidence *not inconsistent* with the facts herein stipulated unless otherwise stated as reserved." (Emphasis added.) Stipulation 27, referencing Exhibit 24–J, does not reserve the issue as to its accuracy but does state: "The truth of assertions within stipulated exhibits may be rebutted or corroborated with additional evidence."

the period of limitations for that year and that the period remains open.[19] *See* sec. 6501(c)(3).

## III. *Section 953(d) Election*

### A. *Validity of Election*

A foreign corporation may elect to be taxed as a domestic entity if the corporation would qualify under the Code as an "insurance company" (if it were a domestic entity) and it meets the other requirements set forth in section 953(d). The parties dispute one of the other requirements, which the IRS included in Notice 89–79, 1989–2 C.B. 392, as guidance for a foreign corporation's making a section 953(d) election.[20] *See also* sec. 953(d)(1)(C) and (D) (authorizing the Secretary to prescribe rules to ensure that taxes imposed on the corporation are paid and stating that the foreign corporation must make the requisite election). The disputed requirement is that a "responsible corporate officer" sign a corporation's election statement.

Ms. Gilpin signed petitioner's section 953(d) election statement under penalty of perjury in her stated capacity as petitioner's secretary, and she was a "responsible corporate officer" if she was petitioner's "president, vice-president, treasurer, assistant treasurer, chief accounting officer, or any other officer duly authorized so to act." *See* sec. 6062; *see also* Notice 89–79, *supra*. Ms. Gilpin's signing of her name on the election statement is prima facie evidence that petitioner authorized her to make the election on its behalf. *See* sec. 6062.

Petitioner argues that its section 953(d) election was invalid because, petitioner states, Ms. Gilpin was not an officer authorized to sign the election statement. We are unpersuaded that Ms. Gilpin lacked the requisite authority to sign the statement. The fact that Ms. Gilpin signed the election under penalty of perjury in her stated capacity as petitioner's officer and that petitioner then filed the election

---

[19] Petitioner also argues that the period of limitations began to run in April 2006 when it gave a Form 1120–F for 2003 to the IRS. We disagree. The IRS never accepted that return, and the return was never filed.

[20] Notice 89–79, 1989–2 C.B. 392, was modified and superseded by Rev. Proc. 2003–47, 2003–2 C.B. 55, but that action is not effective as to the election here.

with the IRS speaks loudly as to petitioner's and Ms. Gilpin's understanding that Ms. Gilpin was then an officer authorized to make the election. The same is true as to petitioner's later reliance on the elected status in applying for tax-exempt status under section 501(c)(15) and the fact that petitioner during this proceeding has not come forward with any credible documentary or testimonial evidence directly refuting that Ms. Gilpin was an officer who was properly authorized on November 16, 1998, to make the election. We also bear in mind that petitioner, after it filed the election statement with the IRS, confirmed its understanding that the election was valid by submitting on or about March 20, 2000, a power of attorney that referenced the election without any dispute as to its validity and that petitioner has repeatedly filed Federal returns consistent with its election. The mere fact that some or all of the Forms 990 that petitioner filed with the IRS may have failed to include a copy of petitioner's election statement and that Notice 89–79, *supra*, instructs a taxpayer to attach its election statement to its "annual income tax return, Form 1120PC or Form 1120L," does not mean, as petitioner concludes, that petitioner's election is rendered invalid ab initio. Nor do we agree with petitioner's assertion that respondent was on notice as to the identity of petitioner's officers so as to know, as petitioner now claims, that Ms. Gilpin was not petitioner's officer at the time of the election. We conclude that petitioner's section 953(d) election was valid. While respondent argues alternatively that the doctrine of estoppel precludes petitioner from contesting the validity of its section 953(d) election, we need not and do not address this alternative argument.[21]

---

[21] We also need not decide respondent's request to amend the answer to allege an affirmative defense of equitable estoppel to petitioner's claim that the election was invalid for lack of signature by a corporate officer. We note, however, that any such amendment appears unnecessary because the petition does not allege that the election was invalid. Rule 34(b)(4) and (5) requires that the petition contain "[c]lear and concise assignments of each and every error which the petitioner alleges to have been committed" and "[c]lear and concise lettered statements of the facts on which petitioner bases the assignments of error", respectively. The petition states simply that respondent erred in determining that the election was revoked during the subject years, thus indicating that petitioner's view as set forth in the petition is that the election is still in place (which, of course, is contrary

Continued

B. *Termination of Election*

A foreign corporation's election under section 953(d) to be taxed as a domestic corporation applies for the year in which the election is made and to all subsequent years, unless terminated or revoked with the Secretary's consent. *See* sec. 953(d)(2). Such an election is terminated when the corporation fails to meet the election requirements prescribed under section 953(d)(1). *See* sec. 953(d)(2)(B). The termination applies for all taxable years beginning after the year in which the corporation failed to meet the election requirements prescribed under section 953(d)(1). *See* sec. 953(d)(2)(B).

Petitioner concedes it was not operating as an insurance company during 2002. Petitioner therefore failed to satisfy that requirement for maintaining the section 953(d) election throughout 2002, *see* sec. 953(d)(1)(B), and its election was thereby terminated. The termination applied to all of petitioner's taxable years after 2002. *See id.*

IV. *Consequences of Termination*

Respondent determined that the termination of petitioner's section 953(d) election caused petitioner to be treated as a taxable corporation which is deemed to have sold its assets to a controlled foreign corporation on January 1, 2003 (which, respondent determined, was a one-day taxable year in and of itself). We agree with this determination.

Upon termination of a corporation's election under section 953(d), the corporation is treated for purposes of section 367 as a domestic corporation which transfers all of its assets to a foreign corporation in an exchange to which section 354 applies. *See* sec. 953(d)(5). The transfer is deemed to occur on the first day of the taxable year following the revocation of the election. *See id.* The "first day" here is January 1, 2003.

Under section 367(a)(1), a foreign corporation receiving property in an exchange to which section 354 applies is gen-

to its claim now that the election was invalid from the beginning). We also note that a pleading need not be amended when issues not raised by the pleadings are tried by express or implied consent. *See* Rule 41(b)(1). It appears that the parties have tried the issue by express or implied consent and that respondent's amendment simply formalizes respondent's position as to petitioner's invalid election claim raised outside of the pleadings. We will deny respondent's request as moot.

erally not considered a corporation for purposes of determining the extent to which gain is recognized by the transferor. Thus, absent an exception, the termination of a corporation's election under section 953(d) results in a deemed transfer of the domestic corporation's assets to a foreign corporation in an exchange that is taxable to the domestic corporation. After the deemed transfer on the "first day", the taxpayer's taxable year as a domestic corporation naturally terminates as of the end of that day, given that it is no longer taxed as a domestic corporation, and the taxable year of the deemed transferee foreign corporation then begins and naturally runs through the end of the transferor's taxable year as ascertained as if the transfer had not occurred.

Petitioner's primary activity during 2002 was managing the real property that its disregarded entity, EFR, owned. All of the real property was in the United States, and the activities related to the management of these properties were performed within the United States by members of the Enniss family. As no exception was applicable at the time of the deemed exchange on January 1, 2003, petitioner's deemed transfer of property is a taxable exchange for which petitioner must recognize gain under section 367. Because petitioner failed to file a Federal income tax return for its taxable year beginning and ending on January 1, 2003, respondent determined petitioner's income tax liability for that one-day taxable year taking into account, inter alia, the deemed sale.

Petitioner argues that section 367 was not intended to apply in the setting at hand. We disagree. By its terms, section 953(d)(5) provides that the termination of petitioner's section 953(d) election requires that petitioner, "[f]or purposes of section 367", be "treated as a domestic corporation transferring (as of the 1st day of such subsequent taxable year) all of its property to a foreign corporation in connection with an exchange to which section 354 applies." We read nothing in section 953, or in section 367, or in the regulations under either provision, that would trump the quoted rule of section 953(d)(5). While petitioner looks to strands of legislative history to support its argument of a contrary legislative intent, the best source of legislative intent is found in the text of the statute. *See Bedroc Ltd., L.L.C. v. United States*, 541 U.S. 176, 177 (2004); *United States v. Lanier*, 520

U.S. 259, 267 n.6 (1997); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–254 (1992). Absent absurd, unreasonable, or futile results, there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940); *cf. Albertson's, Inc. v. Commissioner*, 42 F.3d 537, 545 (9th Cir. 1994), *aff'g* 95 T.C. 415 (1990). Congress has specifically and unambiguously provided in section 953(d)(5) that a termination of a section 953(d) election results in a transfer of property within the rules of section 367, and there is nothing that is absurd, unreasonable, or futile in applying that text as written. We are not unmindful that unequivocal evidence of a clear legislative intent may sometimes override the words of a statute and lead to a different result, but that unequivocal bar is a high one to clear. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *Landreth v. Commissioner*, 859 F.2d 643, 646 n.6 (9th Cir. 1988), *aff'g* T.C. Memo. 1986–242; *Halpern v. Commissioner*, 96 T.C. 895, 899 (1991). The legislative history here provides scant and unpersuasive support for a holding contrary to that which we reach. [22]

Petitioner also argues from a factual point of view that petitioner was not EFR's owner. As petitioner sees it, EFR was a limited liability company that the Enniss family owned directly. Moreover, petitioner asserts, even if the facts formally establish that petitioner was EFR's owner, the substance of the facts trumps their form and requires a contrary finding that the Enniss family directly owned EFR. We disagree in both regards. The record establishes, and we have so found, that petitioner owned EFR. We note in support of this finding, but not as the sole reason for the finding, that petitioner's statements in its returns are admissions that may be overcome only through cogent evidence, *see Waring v. Commissioner*, 412 F.2d 800, 801 (3d Cir. 1969), *aff'g per curiam* T.C. Memo. 1968–126; *Estate of Hall v. Commissioner*, 92 T.C. 312, 337–338 (1989), and that petitioner filed

---

[22] Petitioner argues from an equitable point of view that sec. 367 should not apply because, petitioner states, it will be taxed on the unrealized gain when it eventually sells the properties. We disagree that equity plays any part in our interpretation and implementation of secs. 367 and 953(d)(5) in the setting at hand.

a Form 990 for 2002 and 2003, each of which listed petitioner as the sole owner of EFR.[23] We also note that EFR has never filed a partnership (or corporate) tax return with regard to any of the subject years.[24]

Nor do we believe that the substance of the facts supports petitioner's proposed finding. The U.S. Supreme Court "has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted); *see also Wilkin v. United States*, 809 F.2d 1400, 1402 (9th Cir. 1987); *Lomas Santa Fe, Inc. v. Commissioner*, 693 F.2d 71, 73 (9th Cir. 1982), *aff'g* 74 T.C. 662 (1980).[25] Thus, petitioner and the Enniss family, while they were entitled at the start to structure their affairs so that the Enniss family members owned EFR as of the relevant time, must now accept the consequences of instead causing petitioner to be EFR's sole owner (although their actions on this point probably resulted from questionable legal advice). EFR's ownership as structured by its controlling owners must "be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. at 148. We note in passing, however, that we disagree with petitioner's primary premise for finding that the members of the Enniss family were in substance EFR's owners. The mere fact that petitioner and the Enniss family may have treated EFR as an

---

[23] While petitioner's Form 990 for 2003 failed to be a valid return because it was not signed by one of petitioner's officers, petitioner's preparation and filing of the document with the IRS expressed petitioner's understanding that petitioner was the sole owner of EFR.

[24] Ms. Sandoval and Reid Enniss each testified in a conclusory manner (and without further elaboration) that they were members of EFR. We do not accept this testimony as the credible evidence in the record disproves it.

[25] Of course, where the issue is one of law as to the proper substantive characterization of facts, the label used by the taxpayer may not always be determinative if it is incorrect. *See Selfe v. United States*, 778 F.2d 769, 774 (11th Cir. 1985); *Pinson v. Commissioner*, T.C. Memo. 2000–208; *LDS, Inc. v. Commissioner*, T.C. Memo. 1986–293.

independent entity for purposes of management and operations, as petitioner asserts, does not necessarily mean that EFR was owned by the Enniss family rather than by petitioner.

V. *Subject of Exchange*

Petitioner asserts that it never owned the real property and that it may not be taxed as to any property that EFR owned. We disagree. For Federal income tax purposes, although petitioner may not have actually owned the real property that EFR owned, petitioner is deemed to own EFR's real property because EFR's owners chose to characterize EFR as an entity that is disregarded as separate from its owners. *See* secs. 301.7701–1(a)(4), 301.7701–3(b)(1), Proced. & Admin. Regs.; *cf. Samueli v. Commissioner*, 132 T.C. 37, 39 n.3 (2009) (where a grantor trust was a disregarded entity that owned an interest in a limited liability company, the Court treated the grantor as the owner of that interest), *aff'd and remanded on another issue*, 661 F.3d 399 (9th Cir. 2011). Our disregard of the entity EFR essentially means that we view the facts as if EFR did not exist for Federal income tax purposes and as if EFR's sole owner, petitioner, was the sole owner of EFR's assets. *Cf. Samueli v. Commissioner*, 132 T.C. at 39 n.3.

VI. *Fair Market Value of Disputed Property*

A. *Overview*

The parties dispute the applicable fair market value of four of the property groups. These groups are property groups 1, 3, 4, and 5. We proceed to determine those values.

A determination of fair market value is a factual inquiry in which the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. *See Commissioner v. Scottish Am. Inv. Co.*, 323 U.S. 119, 123–125 (1944); *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294 (1938); *Zmuda v. Commissioner*, 79 T.C. 714, 726 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984). Fair market value is measured as of the applicable valuation date, which in this case is January 1, 2003. *See Estate of Proios v. Commissioner*, T.C. Memo. 1994–442; *Thornton v. Commissioner*, T.C. Memo. 1988–479, *aff'd without published opinion*, 908 F.2d 977 (9th

Cir. 1990). The willing buyer and the willing seller are hypothetical persons, instead of specific individuals or entities, and the characteristics of these hypothetical persons are not always the same as the personal characteristics of the actual seller or a particular buyer. *See Propstra v. United States*, 680 F.2d 1248, 1251–1252 (9th Cir. 1982); *Estate of Bright v. United States*, 658 F.2d 999, 1005–1006 (5th Cir. 1981); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 218 (1990). The views of both hypothetical persons are taken into account, and focusing too much on the view of one of these persons, to the neglect of the view of the other, is contrary to a determination of fair market value. *See Estate of Scanlan v. Commissioner*, T.C. Memo. 1996–331, 72 T.C.M. (CCH) 160 (1996), *aff'd without published opinion*, 116 F.3d 1476 (5th Cir. 1997); *Estate of Cloutier v. Commissioner*, T.C. Memo. 1996–49. Fair market value reflects the highest and best use of the property on the valuation date, and it takes into account special uses that are realistically available because of the property's adaptability to a particular business. *See Mitchell v. United States*, 267 U.S. 341, 344–345 (1925); *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986). Property is generally valued without regard to events occurring after the valuation date to the extent that those subsequent events were not reasonably foreseeable on the date of valuation. *See Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929); *Trust Servs. of Am., Inc. v. United States*, 885 F.2d 561, 569 (9th Cir. 1989); *Bergquist v. Commissioner*, 131 T.C. 8, 17 (2008); *Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013–27.

B. *Approaches Used To Determine Fair Market Value*

1. *Overview*

Generally, three approaches are used to determine the fair market value of property. *See United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992). These approaches are: (1) the market approach, (2) the income approach, and (3) the asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part and remanded on another issue sub nom. JP Morgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006); *Cohan*

*v. Commissioner*, T.C. Memo. 2012–8. The question of which approach to apply in a case is a question of law. *Powers v. Commissioner*, 312 U.S. 259, 260 (1941). Because neither party relies upon the asset-based approach, and we agree that it is not applicable in these cases, we limit our discussion of that approach to a brief explanation of it.

2. *Three Approaches*

a. *Market Approach*

The market approach requires a comparison of the subject property with similar property sold in an arm's-length transaction in the same timeframe. The market approach values the subject property by taking into account the sale prices of the comparable property and the differences between the comparable property and the subject property. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19–20 (1979). The market approach measures value properly only when the comparable property has qualities substantially similar to those of the subject property. *See Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. at 19–20. Where comparable properties are present, the market approach is generally the best determinant of value. *See Whitehouse Hotel Ltd. P'ship v. Commissioner*, 131 T.C. 112, 156 (2008), *vacated and remanded on another issue*, 615 F.3d 321 (5th Cir. 2010); *Van Zelst v. Commissioner*, T.C. Memo. 1995–396, *aff'd*, 100 F.3d 1259 (7th Cir. 1996). Moreover, while unforeseeable events occurring after the valuation date are generally not taken into account in determining a property's fair market value, a sale of other property within a reasonable time after the valuation date may be a proper starting point for the measure of the property's fair market value. *See Estate of Scanlan v. Commissioner*, 72 T.C.M. (CCH), at 162–163 (adjustments made to redemption price to account for passage of time and the change in the setting from the date of the decedent's death to the date of the later redemption); *see also Estate of Trompeter v. Commissioner*, T.C. Memo. 1998–35, 75 T.C.M. (CCH) 1653, 1660–1661 (1998), *vacated and remanded on other grounds*, 279 F.3d 767 (9th Cir. 2002).

b. *Income Approach*

The income approach relates to capitalization of income and discounted cashflow. This approach values property by computing the present value of the estimated future cashflow as to that property. The estimated cashflow is ascertained by taking the sum of the present value of the available cashflow and the present value of the asset's residual value.

c. *Asset-Based Approach*

The asset-based approach generally values property by determining the cost to reproduce it less applicable depreciation or amortization.

C. *Expert Witnesses*

1. *Background*

Each party retained experts to value the properties at issue. Petitioner retained and called Harry B. Holzhauer as a real estate expert and Warren R. Coalson as a mining expert. Respondent retained and called Norman Eichel as a real estate expert and John A. Hecht as a mining expert. Respondent also called Steve C. Cortner to testify in rebuttal to a portion of Mr. Coalson's testimony and recalled Mr. Eichel and Mr. Hecht to testify in rebuttal to the respective testimony of Mr. Holzhauer and Mr. Coalson. Petitioner recalled Mr. Holzhauer and Mr. Coalson to testify in rebuttal to the respective testimony of Mr. Eichel and Mr. Hecht.

2. *Qualifications of Experts*

a. *Mr. Holzhauer*

Petitioner retained Mr. Holzhauer to ascertain the fair market value of the subject nine property groups. Mr. Holzhauer has appraised real estate for over three decades, and he holds the Appraisal Institute designation of MAI, SRA, and SRPA.[26] He has previously testified in Federal and State courts as an expert witness. He has taught classes on appraisal at colleges and for professional organizations for

---

[26] The designation of MAI is awarded to qualifying members of the American Institute of Real Estate Appraisers, and it is the most highly recognized appraisal designation within the appraisal community. The designations SRA (senior residential appraiser) and SRPA (senior real estate property appraiser) are awarded to qualifying members of the Society of Real Estate Appraisers.

approximately two decades. He has developed a course for the IRS on the uniform standards of professional appraisal practice, and he has taught that course for the IRS to IRS agents nationwide.

The Court recognized Mr. Holzhauer as an expert in the field of real estate appraisals, with no objection by respondent.

b. *Mr. Coalson*

Petitioner retained Mr. Coalson to ascertain the cost of reclaiming the mined property, to help determine the value for the mineral resources that remained on the property, and to estimate the amount of potentially developable land that would be created by site reclamation. Mr. Coalson is a mining consultant with over 30 years of experience in the mining industry, inclusive of 23 years of consulting on mining. He has a bachelor of arts degree, with a double major in geography and environmental reclamation, and he has previously testified as an expert on (among other matters) property and mineral resource valuation. For approximately the last 20 years, he has been the president of a company that he founded, which provides environmental and mine permitting services.

The Court recognized Mr. Coalson as an expert in the field of mining, with no objection by respondent.

c. *Mr. Eichel*

Respondent retained Eichel, Inc., to ascertain the fair market value of the subject nine property groups. Eichel, Inc., is a real estate research and appraisal firm which specializes in the valuation of real estate in the Los Angeles, California, and surrounding areas, and in litigation consulting with respect to real estate valuation matters. Eichel, Inc.'s president is Mr. Eichel. Mr. Eichel has a bachelor of science degree from the University of Southern California with a major in finance, and he performed graduate work in the field of real estate research. Mr. Eichel holds the Appraisal Institute designation of MAI.

The Court recognized Mr. Eichel as an expert in the field of real estate appraisals, with no objection by petitioner.

d. *Mr. Hecht*

Respondent retained Sespe Consulting, Inc. (Sespe), and its president Mr. Hecht, to estimate the cost to reclaim property group 1 as of the valuation date, among other things. Mr. Hecht holds a bachelor of science degree in electrical engineering from Valparaiso University and a professional degree in geophysics from Colorado School of Mines. He has worked professionally in the mining industry for almost three decades, and he is a certified registered professional engineer in the State of California and a registered environmental assessor. He currently is the president of Sespe, an environmental and engineering consulting firm, where he devotes approximately 65% of his work to mining and construction material projects (mainly reclamation planning, preparing reclamation plans, and financial cost estimates) in California.

The Court recognized Mr. Hecht as an expert in the field of mining, with no objection by petitioner.

e. *Mr. Cortner*

Mr. Hecht (through his firm) retained Mr. Cortner to determine some costs of product and materials and to assist Mr. Hecht with the applicable reclamation standards. Mr. Cortner has worked in the mining industry in southern California, mostly in and around San Diego County, for over 35 years. The Court did not specifically recognize Mr. Cortner as an expert but allowed him to testify as a fact witness in rebuttal to a portion of Mr. Coalson's testimony.

D. *Applicable Standards*

Each expert testified on direct examination primarily through his expert report, *see* Rule 143(g)(1), which the Court accepted into evidence. Each expert then generally testified on cross-examination, redirect examination, and recross-examination, through the typical question and answer process.

We may accept or reject the findings and conclusions of the experts, according to our own judgment. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. at 294–295; *Parker v. Commissioner*, 86 T.C. 547, 561–562 (1986). In addition, we may be selective in deciding what parts (if any) of their opinions to accept. *See Parker v. Commissioner*, 86 T.C. at 561–562. We

also may reach a determination of value based on our own examination of the evidence in the record. *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974–285.

E. *Analysis*

1. *Nine Property Groups*

Mr. Holzhauer and Mr. Eichel each valued the nine property groups discussed herein. As part of his analysis, Mr. Holzhauer reduced his total value of the nine property groups by 15% to apply a "bulk discount" and then rounded that number to reach his final total value. Mr. Eichel did not apply a similar discount to his total value.

The parties later agreed on the applicable fair market values of property groups 2, 6, 7, 8, and 9. The fair market values that Mr. Holzhauer and Mr. Eichel ascertained and the agreed amounts are as follows:

| Property group | Mr. Holzhauer | Mr. Eichel | Agreed value |
|---|---|---|---|
| 1 | $5,000,000 | [1]$15,876,000 | --- |
| 2 | 300,000 | 2,100,000 | $500,000 |
| 3 | 3,625,000 | 5,425,000 | --- |
| 4 | 5,000,000 | 6,250,000 | --- |
| 5 | 450,000 | 5,000,000 | --- |
| 6 | 310,000 | 425,000 | 367,500 |
| 7 | 962,000 | 918,000 | 918,000 |
| 8 | 126,000 | 126,000 | 126,000 |
| 9 | 210,000 | 145,000 | 145,000 |
| Total | 15,983,000 | 36,265,000 | --- |
| Discount | 2,397,450 | -0- | --- |
| Net | 13,585,550 | 36,265,000 | --- |
| Rounded | 13,600,000 | 36,265,000 | --- |

[1] Mr. Eichel in his original written expert witness report valued this property at $16,200,000 but revised this number in his rebuttal report to $15,876,000 to correct for a computational error of $324,000 that he discovered in his original written expert witness report and direct testimony.

We are therefore left to decide the fair market values of the remaining property groups as well as the appropriateness of a "bulk discount". In rendering our decisions, we are aided by the testimony of each of the four experts, all of whom we consider to be qualified in their areas of expertise. Each expert testified in favor of the party who called him, and we have weighed the experts' testimony with due regard to their

qualifications, the credible evidence in the record, and our judgment. *See Estate of Christ v. Commissioner*, 480 F.2d 171, 174 (9th Cir. 1973), *aff'g* 54 T.C. 493 (1970); *Chiu v. Commissioner*, 84 T.C. 722, 734 (1985). On some matters, we were persuaded more by petitioner's experts than by respondent's experts, while on other matters we were persuaded more by respondent's experts than by petitioner's experts.

2. *Property Group 1*

a. *Overview*

We summarize each expert's valuation of property group 1 as follows:

|  | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|
|  | *Mr. Holzhauer* | *Mr. Eichel* | *Mr. Holzhauer* | *Mr. Eichel* | *Mr. Holzhauer* | *Mr. Eichel* |
| Tonnage | 188,000 | 148,164 | 188,000 | 193,455 | 188,000 | 122,037 |
| Royalty rate (per ton) | $4 | --- | $4.14 | --- | $4.28 | --- |
| Sale price | --- | $14.50 | --- | $15 | --- | $15.50 |
| Sales revenue | --- | $2,148,378 | --- | $2,901,825 | --- | $1,891,574 |
| Fill material fees | --- | $70,000 | --- | $130,000 | --- | $400,000 |
| Gross income[1] | $752,000 | $2,218,378 | $778,320 | $3,031,825 | $805,561 | $2,291,574 |
| Reclamation costs | --- | --- | --- | --- | --- | --- |
| Selling costs | --- | --- | --- | --- | --- | --- |
| Real estate taxes | $28,500 | $53,500 | $29,070 | $54,570 | $29,651 | $55,661 |
| Production cost | --- | $592,656 | --- | $773,820 | --- | $549,167 |
| Fill material processing | --- | $5,000 | --- | $5,000 | --- | $200,000 |
| SG&A | --- | $200,000 | --- | $200,000 | --- | $200,000 |
| Net operating income | $723,500 | $1,367,222 | $749,250 | $1,998,435 | $775,910 | $1,286,746 |
| Reclamation costs | --- | --- | --- | --- | --- | --- |
| Zoning action | --- | --- | --- | --- | --- | --- |
| Land sale | --- | --- | --- | --- | --- | --- |
| Permit compliance | --- | $250,000 | --- | --- | --- | --- |
| Total | --- | $1,117,222 | --- | $1,998,435 | --- | $1,286,746 |
| Discount factor[2] | .8811 | | .7763 | | .6839 | |
| PV NOI | $637,445 | | $604,180 | | $550,948 | |

|  | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|
|  | *Mr. Holzhauer* | *Mr. Eichel* | *Mr. Holzhauer* | *Mr. Eichel* | *Mr. Holzhauer* | *Mr. Eichel* |
| Tonnage | 188,000 | 148,623 | 188,000 | 66,377 | --- | 26,568 |
| Royalty rate (per ton) | $4.43 | --- | $4.59 | --- | --- | --- |
| Sale price | --- | $16 | --- | $16 | --- | $14.50 |
| Sales revenue | --- | $2,377,968 | --- | $1,062,032 | --- | $385,497 |

| | 2006 | | 2007 | | 2008 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Mr. Holzhauer | Mr. Eichel | Mr. Holzhauer | Mr. Eichel | Mr. Holzhauer | Mr. Eichel |
| Fill material fees | --- | $1,200,000 | --- | $375,000 | --- | $250,000 |
| Gross income[1] | $833,756 | $3,577,968 | $862,937 | $1,437,032 | --- | $635,497 |
| Reclamation costs | --- | --- | --- | --- | $24,600,000 | --- |
| Selling costs | --- | --- | --- | --- | --- | --- |
| Real estate taxes | $30,244 | $56,775 | $30,849 | $57,910 | $31,466 | $59,068 |
| Production cost | --- | $743,115 | --- | $356,074 | --- | $150,211 |
| Fill material processing | --- | $600,000 | --- | $125,000 | --- | $25,000 |
| SG&A | --- | $200,000 | --- | $200,000 | --- | $200,000 |
| Net operating income | $803,511 | $1,978,078 | $832,088 | $689,048 | ($24,631,466) | $201,218 |
| Reclamation costs | --- | --- | --- | --- | --- | --- |
| Zoning action | --- | --- | --- | $34,000 | --- | $33,000 |
| Land sale | --- | --- | --- | --- | --- | --- |
| Permit compliance | --- | --- | --- | --- | --- | --- |
| Total | --- | $1,978,078 | --- | $655,048 | | $168,218 |
| Discount factor[2] | .6026 | | .5309 | | .4678 | |
| PV NOI | $502,407 | | $458,142 | | ($11,522,600) | |

| | 2009 | | 2010 | Total |
| --- | --- | --- | --- | --- |
| | Mr. Holzhauer | Mr. Eichel | Mr. Eichel | Mr. Holzhauer |
| Tonnage | --- | 29,126 | --- | --- |
| Royalty rate (per ton) | --- | --- | --- | --- |
| Sale price | --- | $14 | --- | --- |
| Sales revenue | --- | $407,764 | --- | --- |
| Fill material fees | --- | $250,000 | $125,000 | --- |
| Gross income | $34,505,673 | $657,764 | $125,000 | --- |
| Reclamation costs | --- | --- | --- | --- |
| Selling costs | $1,035,170 | --- | --- | --- |
| Real estate taxes | $32,096 | $60,250 | $61,455 | --- |
| Production cost | --- | $164,562 | --- | --- |
| Fill material processing | --- | $25,000 | --- | --- |
| SG&A | --- | $200,000 | $25,000 | --- |
| Net operating income | $33,438,407 | $207,952 | $38,545 | --- |
| Reclamation costs | --- | --- | $2,547,529 | --- |
| Zoning action | --- | $33,000 | --- | --- |
| Land sale | | | | |
| Parcel A–D | --- | --- | $18,220,000 | --- |
| Parcel E | --- | --- | $15,188,500 | --- |
| Total | --- | $174,952 | $30,899,516 | --- |
| Discount factor[2] | .4121 | | --- | --- |
| PV NOI | $13,779,967 | | --- | $5,040,211 |
| NPV @14% | | | $15,876,320 | --- |
| Rounded | | | $15,876,000 | $5,000,000 |

[1] For each year 2005 through 2007, the gross income shown in Mr. Holzhauer's columns is slightly different from the product of his royalty rate shown for the year, and 188,000. Mr. Holzhauer first calculated the gross income for 2003 and then calculated the gross income for each year 2004 through 2007 by increasing the previous year's gross income by 3.5%. Mr. Holzhauer then backed into his royalty rates by dividing the income for the year by 188,000, and rounding the quotient to the nearest cent.

[2] For each year 2003 through 2007, the PV NOI shown in this chart is slightly different from the product of the net operating income shown for the year and the discount factor shown for the year. Mr. Holzhauer rounded his discount factors shown in this chart to the nearest ten-thousandths, but he apparently did not round the factors when performing his calculations. For 2003, Mr. Holzhauer multiplied his discount factor by net operating income to arrive at his PV NOI. For each of the other years 2004 through 2007, Mr. Holzhauer multiplied his discount factor by gross income to arrive at his PV NOI.

With a single exception, we find that Mr. Holzhauer's analysis underlying his $5 million value is a better measure of property group 1's fair market value than Mr. Eichel's analysis underlying his $15,876,000 value, notwithstanding that Mr. Holzhauer's analysis sometimes appears to be outcome driven. While both Mr. Holzhauer and Mr. Eichel generally ascertained their values as the sum of the present value of the remaining mineable sand on the property plus the present value of the residuary interest in the property, only Mr. Holzhauer adequately recognized as of the valuation date that the property was primarily in poor condition, out of compliance with the MUP, and zoned primarily for agricultural use; that the property's value stemmed mainly from the underlying real property; and that the mining operation was conducted by Enniss, Inc., not petitioner. Mr. Holzhauer also opined most persuasively that the highest and best use of property group 1 was to extract the remaining sand, then perform reclamation, and then to redevelop or to sell the land; and that the value of the remaining sand was best derived on the basis of the net income from royalties that a third party would pay for extracting the sand, *see, e.g.*, *Terrene Invs., Ltd. v. Commissioner*, T.C. Memo. 2007–218 (the Court used a royalty-based income capitalization method to value a tract of land with sand and gravel deposits), as opposed to, as Mr. Eichel concluded, an extraction of the sand by the land owner.[27] The single exception is that Mr. Holzhauer, in contrast to Mr. Eichel, improperly minimized the value that inhered in the tipping fees that the owner of property group 1 would receive as to the property. We turn to discuss some specifics of Mr. Holzhauer's valuation and our discussion of the tipping fees.

b. *Value of Remaining Mineable Sand*

i. *Background*

Mr. Holzhauer ascertained his value of the remaining mineable sand by relying upon Mr. Coalson's opinion of the

---

[27] Mr. Eichel also considered various sales of property that occurred in 2007 to ascertain the fair market value of property group 1 (and property groups 3 and 4). We disagree with his use of those sales which occurred too far after the valuation date.

volume of the remaining sand, the rate of extraction, and the per-ton value for the remaining material.

ii. *Mineable Sand*

Mr. Coalson calculated the volume of extractable sand on the basis of a review of the site of and MUP conditions of parcels A through D as of the valuation date. He concluded that no material remained for excavation in the lake portions of property group 1 and estimated the recoverable material as the product of: (1) the undisturbed acreage on parcels B, C, and D (taking into account certain setbacks as required under the MUP); (2) an assumed excavation depth in conformity with the MUP; and (3) a conversion factor for cubic yards per acre/foot. He arrived at an estimated volume of 625,000 cubic yards of remaining sand and applied the appropriate conversion factor of 1.5 tons per cubic yard to reasonably calculate that 940,000 tons of recoverable salable sand remained on the premises. The then-current market price for washed sand was $14.50 per ton in 2003, a total value in place at 2003 prices of $13,640,000.[28] He likewise reasonably assumed that the remaining sand would be mined at the same approximate rate that it was previously mined (plus or minus 200,000 tons a year) and reasonably concluded that the mine life was five years given that the mine was five years from depletion as of the valuation date. He conservatively ascertained that the remaining sand would be extracted at an even rate over the five-year period (in other words, at 188,000 tons (940,000/5) per year).[29]

Mr. Coalson opined credibly that as of the valuation date there was a high demand in San Diego County for 940,000 tons of sand. He valued the remaining sand under two scenarios: (1) the property owner mines the sand and (2) a third party mines the sand and pays the property owner a royalty for the sand. As to the first scenario, i.e., the owner mines

[28] There appears to be a rounding or math error of $10,000 (i.e., 940,000 × 9.50 = $13,630,000).

[29] Mr. Eichel, on the other hand, estimated that the remaining sand was 734,368 tons and that this sand would be extracted over a seven-year period at rates that he improperly ascertained through his consideration of data that was not reasonably foreseeable as of the valuation date. In line with this estimate, Mr. Eichel also unpersuasively concluded that property group 1 would be sold in 2010.

the sand, Mr. Coalson explained that the owner would first have to acquire a permit to mine the sand and that the permit process had previously taken 18 years in the case of one site in San Diego County. As to the second scenario, i.e., a third party mines the sand and pays a royalty for the sand, Mr. Coalson explained that royalty arrangements were common in circumstances where the owner did not want to develop a mining plan, hire consultants, and get the requisite permit. He opined that an owner of a sand mine in San Diego County would likely enter into a royalty agreement with a mining company rather than mine the property itself. He estimated a "very generous royalty rate" of $4 per ton for sand mined by the third party, explaining that his estimate was derived from two royalty agreements that his company aggressively negotiated in Lakeside during 2002, and opined reasonably that the owner would expect a 3.5% annual increase in that rate to take into account inflation. Mr. Holzhauer concluded that the real property owner would pay the real estate taxes and the reclamation costs.

Mr. Holzhauer projected that $24.6 million of reclamation costs would be owed in 2008, the year after the sand was excavated. Mr. Coalson had estimated that the reclamation costs would total $24,913,003, using unadjusted 2003 price data to estimate that amount, and Mr. Holzhauer first rounded that amount to $25 million and then ultimately concluded that reclamation costs would total $24.6 million. Mr. Holzhauer did not explain why he ultimately reduced the $25 million to $24.6 million.

As Mr. Coalson saw it, as of the valuation date, the volume of fill required to reclaim the mining pits in the sand mine was 1,982,500 cubic yards determined as follows: [30]

---

[30] Mr. Hecht opined that no fill need be added to the northerly lake or to a portion of the southerly excavation area. We disagree. Mr. Coalson testified persuasively that the northerly lake had to be filled, noting among other things that the sand in the lake was very permeable, as contrasted with the compacted sand found in the pits, and that fill had to be added to the lake to raise the bottom of the lake to its required depth. As to the southerly extracted area, Mr. Hecht opined that this area need not be filled because nothing was extracted from that area during 2003. Mr. Coalson opined, however, that the sand on property group 1 would be extracted over a five-year period. Mr. Hecht acknowledged in his testimony that the 625,000 cubic yards of fill would appropriately be taken into ac-
Continued

| Fill area | Cubic yards |
|---|---|
| Northerly lake | 372,500 |
| Southerly lake | 985,000 |
| Remaining southerly extraction area | 625,000 |
| Total volume backfill required | 1,982,500 |

Mr. Coalson logically determined these amounts by multiplying the area that was required to be filled by the depth of the area. Mr. Coalson determined on the basis of his review of the market that the fill would cost $9.50 per cubic yard, or $18,833,750 in total (1,982,500 × $9.50), which takes into account both the price to purchase specialized fill and to transport the fill to the site. Mr. Coalson also took into account various other secondary costs relating to the property's reclamation and arrived at a total reclamation cost of $24,913,003 (which, as previously mentioned, Mr. Holzhauer rounded down to $24.6 million).

Mr. Holzhauer concluded that the owner of the sand mine would receive no income from the acceptance of fill because, Mr. Holzhauer stated, this income does not relate to the real property value. Mr. Holzhauer rationalized that income generated from tipping fees had "nothing to do" with the owner of the land into which the fill was deposited. Mr. Coalson (and thus Mr. Holzhauer) did not consider whether the owner of property group 1 could receive free fill from the Hanson site because he believed that Hanson desired a buyer for its fill and would not give its fill to a competitor for free. Mr. Coalson also opined that Hanson's excess fill was dedicated to fill one of its own projects and was unavailable to fill property group 1. Mr. Coalson also asserted, without further elaboration, that accepting free fill was contrary to "state policy" because its availability at the time of need could not be foreseen with any certainty.

count if the amount of sand was extracted in 2003 but that applicable financial standards do not take this amount into account because the extraction is after one year. We do not believe that the referenced one-year rule is an appropriate guide to ascertaining the fair market value of property group 1. Instead, we believe that the hypothetical willing buyer and the hypothetical willing seller would take into account all costs associated with the property, whether the anticipated costs are to be incurred before one year or afterwards.

We disagree with Mr. Holzhauer that the ability to receive tipping fees with respect to property group 1 has nothing to do with the owner of the property or, more importantly, with a determination of the fair market value of property group 1. Mr. Eichel persuasively opined that these fees belong to the owner of the property, and he took the fees into account in his analysis. Moreover, as we see it, a hypothetical willing buyer and a hypothetical willing seller would both take into account the ability to receive tipping fees from property group 1 when agreeing on the purchase price of that property. The ability to receive income as to property is an important attribute of the property and factors into its value. To say the least, net-income-producing property is certainly worth more than the exact same property that does not produce net income.

That said, we believe that a hypothetical purchaser would not assume, as of the valuation date, that it could receive the relevant industry minimum $2 per ton tipping fee or benefit from free fill over the next five years of the sand mine operation plus any additional time required to complete the land reclamation project. Tipping fees and free fill are factually speculative, depending on time-sensitive nearby demand and nearby supply, and could be achieved only as long as San Diego County and the California Department of Conservation permitted the sand mine operation and/or reclamation activities to continue. Any such continuation was speculative, as of the valuation date, in view of the uncontradicted testimony that SMARA, Cal. Pub. Rec. secs. 2710 and 2773, required an appropriate financial assurance mechanism to ensure that adequate funds to complete all required reclamation work are available when mining ends.[31] The sand mine was out of compliance with that provision given that an appropriate reclamation financial assurance plan was not then in place. The original 1990s financial plan was obsolete

---

[31] See generally *People ex rel. Dept. of Conservation v. El Dorado County*, 116 P.3d 567 (Cal. 2005), as to procedural enforcement matters and *People ex rel. Connell v. Ferreira*, 2003 WL 22022032 (Cal. Ct. App. 2003), and *McCain v. County of Lassen*, 2003 WL 123065 (Cal. Ct. App. 2003), as to fines and penalties.

because significant mining had occurred since then and the posted $40,000 bond for that plan had expired.[32]

Other serious major problems with the MUP and with the reclamation plan were present as of the valuation date. The MUP set numerous requirements that were not met. The MUP required the construction of certain roads, but those roads were not then built. Sand had been mined too close to the roadways to allow an acceptable slope on the sides of the pits. Sand was mined in large quantities far below the permitted maximum mining depth. Reclamation and channel work were far behind schedule. The approved mining plan regulating which areas were to be mined first and in which order, known as the mining phases, had been ignored on account of flooding and the lack of channel work. Consequently, the sand mine's entire operation was at significant risk that the underlying business could, and would, be fined and/or shut down by San Diego County and/or by the California Department of Conservation and the required reclamation work demanded immediately.

Should that have occurred, there would be no further revenue from sand sales or tipping fees until, if ever, government authorities approved a new MUP and reclamation plan. Even worse, a shutdown would force use of the Hanson fill if still available and permission for the conveyor system could be obtained, or if not, suitable fill material would have to be purchased on the open market to reclaim the land at great cost. These facts would be of great concern to a hypothetical purchaser and would significantly temper its

---

[32] In 2005, San Diego County pursued the matter further and Enniss, Inc., after several meetings, persuaded the county to accept a $2.9 million letter of credit coupled with Hanson's representation that Enniss, Inc., could use fill available on the Hanson site to reclaim Enniss, Inc.'s sand mine. Whether Enniss, Inc., could have actually used the Hanson fill, however, was questionable because Hanson also was considering using some or all of that fill for other projects. Moreover, even if Hanson allowed Enniss, Inc., to use the fill, there was no certainty that the required conveyor system which would require at least an easement over the nearby properties could be constructed to transport the fill between the two sites. Absent the Hanson fill, the necessary but then-absent bond or letter of credit to keep the sand mine open would have had to be in the amount of approximately $20 million as the county had indicated that the bond or letter of credit would have to reflect the cost of two million cubic yards of fill at $9.50 per cubic yard.

thinking regarding the purchase price and any offsetting consideration of potential tipping fees and free fill.

Still, sand mine owners and operators in San Diego County routinely received tipping fees in exchange for allowing others to dump debris in the pits at their mines. We fail to see why a hypothetical owner of property group 1, to the extent that it could, would not charge a tipping fee to do the same at that site.[33] While Mr. Coalson testified that specialized fill had to be used to reclaim property group 1, we are unpersuaded that this is the case as to all of the property. In fact, as Mr. Hecht pointed out, environmental documents for property group 1 state specifically that construction debris can be used to fill the pits.

Fill for dumping was available as of the valuation date, yet Mr. Coalson improperly minimized the receipt of the tipping fees when ascertaining his value of property group 1.[34] The record does not allow us to find with precision the portion of the 1,982,500 cubic yards of fill that the hypothetical owner of property group 1 would have to pay $9.50 for vis-a-vis the portion that the owner would pay nothing for but instead would receive tipping fees. We believe it reasonable to reduce Mr. Holzhauer's calculation that the owner would pay $9.50 for each of the 1,982,500 cubic yards of fill by a stated amount in tipping fees and then apply the net amount to the 1,982,500.

To the extent that Mr. Coalson asserted that State policy for determining an appropriate financial assurance plan prohibits the receipt of fill for free would also apply to receiving fill and a tipping fee, we are unpersuaded that any such policy is as cut and dried as Mr. Coalson stated. Mr. Coalson did not explain or otherwise elaborate on his asserted policy, and the record establishes apart from the determination and

[33] Tipping fees are inversely related to hauling costs.

[34] The record does not allow us to find as of the valuation date the exact amount of fill that could be received either for free or with a tipping fee. We note, however, that on November 9, 2004, Chad Enniss informed the Department of Planning and Land Use that five nearby named "truckers and dirt brokers" had 3,721,000 cubic yards of fill available for dumping within a one-year period and that these truckers and brokers had expressed a desire to dump their product at the sand mine. He also named 20 other dirt and rubble producers in the county and stated that the 25 total producers were "just a small list of company's that haul, dump, or produce dirt or rubble".

approval of financial assurance plans that in the real operating world sand mines regularly received tipping fees during the relevant period. At the same time, we are unpersuaded that the hypothetical buyer and the hypothetical seller would have concluded, as of the valuation date, that fill for property group 1 could be obtained and economically transported from the Hanson site.

Valuation is an inexact science which does not call for scientific precision, *see, e.g.*, *Frazee v. Commissioner*, 98 T.C. 554, 577 (1992), and we believe that simply reducing the $9.50 cost by three-fourths of the minimal but customary $2 per ton in tipping fees (i.e., by $1.50 per ton) is the best measure for the overall cost of the fill related to property group 1 to adequately consider the risk of a government shutdown and to blend the amount of fill that would be purchased vis-a-vis the amount of fill that would be accepted for a fee. The parties should factor these tipping fees into Mr. Holzhauer's calculation in their Rule 155 computation(s).[35]

c. *Residuary Interest in Property*

Mr. Holzhauer calculated a value for the reclaimed sand mine on the basis of his valuation of the underlying individual parcels. His calculation assumed a highest and best use of each lot primarily as storage. He reviewed 12 real property sales as part of his analysis. The sites of the properties underlying these sales were as follows:

| Sale 1 | 12566 Vigilante Rd., Lakeside CA |
| Sale 2 | 9120 Jamacha Rd., Spring Valley CA |
| Sale 3 | Woodside Ave. and Wheatlands Rd., Santee CA |
| Sale 4 | ES Rockville St., Santee CA |
| Sale 5 | SWC Jamacha Blvd. and Folex Way, Spring Valley CA |
| Sale 6 | 1596 North Johnson Ave., El Cajon CA |
| Sale 7 | 10007 Riverford Rd., Lakeside CA |
| Sale 8 | Woodside Ave., North of Marilla Dr., Lakeside CA |
| Sale 9 | Woodside Ave. and Hartley Rd., Santee CA |
| Sale 10 | 11322 North Woodside Ave., Santee CA |
| Sale 11 | SEC Riverford Rd. & Riverside Dr., Lakeside CA |
| Sale 12 | NWC Mapleview St. & Channel Rd., Lakeside, CA |

---

[35] As a point of clarification, Mr. Holzhauer's $24.6 million of reclamation costs in 2008 should be reduced by $4,460,625 in tipping fees (i.e., $1.50 per ton × the 1.5 tons per cubic yard conversion rate × 1,982,500 cubic yards). We recognize that each cubic yard of fill received with a tipping fee will likewise produce a savings of $9.50 per cubic yard and have blended that savings into our $1.50-per-ton calculation.

The pertinent information underlying the sales (as adjusted to reflect additional costs to the buyers for items such as required fill or grading and adjustments for size to reflect actual usable land) is as follows: [36]

| Sale # | Sale date | Sale price | Acreage | Square feet[1] | Price/SF | Zoning | Use |
|---|---|---|---|---|---|---|---|
| 1 | Oct. 02 | $635,094 | 1.08 | 47,045 | $13.50 | M58 | Industrial development; outdoor storage |
| 2 | May 02 | 650,000 | 1.09 | 47,480 | 13.69 | M54 | Industrial development; outdoor storage |
| 3 | May 02 | 681,507 | 1.39 | 60,548 | 11.26 | IL | Industrial development |
| 4 | Apr. 01 | 750,000 | 1.50 | 65,340 | 11.48 | IL | Church parking |
| 5 | Apr. 03 | 1,310,000 | 2.36 | 102,802 | 12.74 | M58 | To build ministorage |
| 6 | Mar. 04 | 1,277,000 | 3.81 | 165,964 | 7.69 | M | Industrial development; outdoor storage[2] |
| 7 | Apr. 02 | 1,335,000 | 3.86 | 168,142 | 7.94 | S88 | Industrial development |
| 8 | Aug. 03 | 1,218,500 | 4.78 | 208,217 | 5.85 | S88 | Industrial development |
| 9 | July 03 | 2,251,177 | 5.44 | 236,966 | 9.50 | IL | Industrial development |
| 10 | Sept. 04 | 2,200,000 | 7.29 | 317,552 | 6.93 | IG | Industrial development; outdoor storage[2] |
| 11 | Feb. 00 | 2,711,500 | 8.00 | 348.480 | 7.78 | S88 | Industrial development |
| 12 | June 04 | 2,140,000 | 20.06 | 873,814 | 2.45 | S88 | Preservation |

[1] One acre equals 43,560 square feet.
[2] The use for outdoor storage depends on a conditional permit.

Mr. Eichel's comparable sales, by contrast, involved many properties which were sold in 2007 and other properties which were not actually comparable to the properties underlying property group 1.

Mr. Holzhauer considered sales 1, 2, 6, and 10 to be the most relevant to his analysis because they each were actually used or going to be used for outdoor storage. He reasonably concluded that sale 1 was the most relevant sale because the underlying parcel was on Vigilante Road and had been purchased primarily for outdoor storage. He also reasonably considered sales 2, 6, and 10 to ascertain the square-foot value of the reclaimed land because the reclaimed land was much larger than the property underlying sale 1. He concluded from these four comparable sales that the sand mine parcels, when fully reclaimed, had an average value as of the valuation date of $8 per square foot (or approximately $24.5 million in total). He then applied a real estate appreciation factor of 5% per year to arrive at a future residuary value of $34,505,673 in 2009 for the fully reclaimed properties and reduced that value by selling expenses of approximately 3% ($1,035,170) to be incurred when the reclaimed property was sold in 2009. Costs included annual real estate taxes of 1.5%

[36] M54 and IG zoning is general industrial use. IL zoning is light industrial use. S88 zoning is limited industrial use.

of the market value of the property, with a 2% annual increase ($32,096 per year by 2009).

d. *Applicable Discount Rate*

Mr. Holzhauer applied a 13.5% discount rate to capitalize cashflows arising from property group 1 to arrive at a final present value for the property of $5,040,211 before consideration of the cost to comply with certain MUPs and the value of real property improvements (e.g., a 4,300-square-foot office building on parcel E). After considering these items, $330,000 and $400,000, respectively, he arrived at a value of $4,995,000, which he rounded to $5 million. He opined that this rate was appropriate because an investment in royalties from a sand mine carried a high risk, given the regulatory risk, reclamation risks, and the risk of demand and pricing for sand. He reviewed the yield rates listed in a reliable survey of real property economic indicators and chose 13.5% as a rate that was slightly less than the mean rate for higher risk properties.

We agree that Mr. Holzhauer's 13.5% rate is a reasonable rate to apply in the setting at hand and in conjunction with our resolution of the fill dirt costs. Discount rates are generally set at the rates of return that property buyers in the marketplace will demand to invest in property, *see, e.g.*, *Terrene Invs., Ltd. v. Commissioner*, T.C. Memo. 2007–218, and the rate to apply in a given case must reflect an adequate return on investment with due respect to the attendant risks in the investment. As of the valuation date, an investment in property group 1 was a high risk, given among other things that the property was in poor condition and many of the MUP and reclamation plan conditions were not met. The 13.5% rate, which falls within the lower half of the high risk rates included in the referenced survey, is reasonable in that it reflects a sensible return on investment as of January 1, 2003, when considering the attendant risks in investing in property group 1.

3. *Property Groups 3 and 4*

These property groups include eight parcels on either side of Vigilante Road. Mr. Holzhauer opined that the applicable fair market values of property groups 3 and 4 were

$3,625,000 and $5 million, respectively.[37] He arrived at those values by applying a sales comparison approach and by comparing the attributes of the parcels underlying property groups 3 and 4 and the comparable properties. Mr. Eichel ascertained that the rounded respective values were $5,425,000 and $6,250,000 using a comparative sales analysis that reviewed the same properties he reviewed to value the residuary interest in property group 1. As was similarly true in the case of property group 1, the properties underlying Mr. Eichel's comparable sales were for the most part not comparable to the parcels in property groups 3 and 4 or the sales were too far removed from the valuation date.

We find Mr. Holzhauer's analysis underlying his values to be more persuasive than Mr. Eichel's analysis underlying his values. Mr. Holzhauer determined the highest and best use for property groups 3 and 4 to be continued use for open storage or outdoor manufacturing. He valued property groups 3 and 4 using 11 of the 12 comparable sales he analyzed in valuing the reclaimed land in property group 1 (he concluded that the remaining sale was not pertinent to this valuation). He ascertained that the mean of the 11 sales was $9.77 per square foot and noted that the sale price per square foot tended to decrease for those sales as the size of the property increased.

Mr. Holzhauer reasonably concluded that sale 1, the underlying parcel of which was the smallest parcel in the 11 sales, was a good benchmark in valuing the smallest parcels in property groups 3 and 4 because the property underlying

---

[37] He broke down these amounts as follows:

| Property | Acres | Value/SF | Value |
|---|---|---|---|
| G | 2.86 | $10 | $1,245,816 |
| H | 4.70 | 9 | 1,842,588 |
| I | .88 | 14 | 536,659 |
| Total | | | 3,625,063 |
| Total (as rounded) | | | 3,625,000 |
| J | 1.05 | 13 | 594,594 |
| K | 2.37 | 12 | 1,238,846 |
| L | 1.14 | 14 | 695,218 |
| M | 1.29 | 13.50 | 758,597 |
| N | 3.93 | 10 | 31,711,908 |
| Total | | | 4,999,163 |
| Total (as rounded) | | | 5,000,000 |

sale 1 was on the same block as the properties underlying property groups 3 and 4. He also reasonably concluded that sales 7, 8, and 9 provided guidance on the impact of size on value. He acknowledged that group 3 property was sold in 2007, but here where the sale was more than four years later he properly minimized or disregarded that sale either because the value of industrial properties had surged since 2004 or the sale date was too far removed from the valuation date.[38]

4. *Property Group 5*

Mr. Holzhauer opined that the applicable fair market value of property group 5 was $450,000. Mr. Eichel ascertained that the applicable value was $5 million. We find that the value was $3,975,000 (or, as explained below, $5 million as adjusted to reflect an average 1% per month appreciation in the property from the valuation date to the original option exercise date of August 12, 2004).

Mr. Eichel noted that property group 5 was under option as of the valuation date for purchase at a price of $5 million. He noted that the property was later sold to a national builder of homes and opined that a key element of the value of property group 5 was the option purchase price. He analyzed other sales of similar residential development land in the surrounding area and concluded that the $5 million option price for property group 5 was significantly lower than the other sale prices but that a reasonable purchaser would pay no more than $5 million for property group 5.

Mr. Holzhauer minimized the fact that Santee was driving a development of the property surrounding property group 5 and determined that the highest and best use for property group 5 was mining with a remote possibility of future residential development. He ascertained his $450,000 fair market value for property group 5 by first determining a trended value for the property on the basis of the price that

---

[38] Actual sales of the same property within a reasonable period after the valuation date are relevant and admissible. *See Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013–27, at *50-*58 (and cases cited threat). That said, where relevant events materially affecting value were not reasonably foreseeable on the valuation date, the price effect of those events should be discounted or adjusted in determining value as of the valuation date, or the entire subsequent sale should be disregarded.

petitioner paid for the property approximately 54 months before the valuation date. He then applied an appreciation rate of approximately 1% per month to reflect the appreciation of industrial land. He concluded that the option agreement was irrelevant to his valuation of property group 5 because, he stated, the rules of valuation require that the property be valued as if it were for sale "free and clear" of the option.

We disagree with Mr. Holzhauer's analysis as to property group 5. Contrary to his belief, the option agreement was not irrelevant in valuing property group 5. In addition, contrary to petitioner's statements in its brief, we do not ignore the option agreement in valuing property group 5 or otherwise value that property as if it were for sale free and clear of the option. The fact that property group 5 was subject to the option agreement on the valuation date and that our hypothetical buyer and hypothetical seller are considered to know the same are important facts that must be taken into account when valuing that property. In other words, the hypothetical buyer and the hypothetical seller in buying and selling the property would know that the option agreement, as it existed on the valuation date, had to be consummated by August 12, 2004 (20½ months after the valuation date). This agreement further provided that the owner of the property immediately before consummation of the option would either sell property group 5 to the optionee for $5 million, or if it did not, the owner, petitioner, would sell the optionee the referenced easements for $2 million, in which case the optionee at its cost would improve the access road and stub utilities at the access road to all other approved property lots. [39] While the initial optionee may have been a strategic

---

[39] Petitioner invites the Court to find as a fact that the optionee had both an option to purchase property group 5 for $5 million and an option to purchase the easements for $2 million. We decline to do so. As we read the option agreement, and as we ultimately find in consideration of the record as a whole, the option applies only to the purchase of property group 5 for $5 million. To be sure, the option agreement explicitly distinguishes the option from the mandatory sale of the easements. The option agreement states in part:

In the event that Optionee does not exercise the Option provided for herein, Optionor shall sell to Optionee an easement for ingress and

Continued

buyer as Mr. Holzhauer opined, this does not mean, as Mr. Holzhauer concluded, that a hypothetical willing buyer and a hypothetical willing seller would ignore the fact that the optionee was contemplating buying the property at a future date for $5 million. Nor would the hypothetical willing buyer and the hypothetical willing seller ignore the fact that the optionee was obligated to pay $2 million to the owner of the property for easements on the property, make road improvements, and stub utilities if the optionee did not exercise the option.

As we see it, forgetting for the moment any appreciation in property group 5 between the valuation date and the date that the option is consummated, that property was worth at least approximately $2 million on the valuation date given that the optionee, at a minimum, was going to pay $2 million for easements on the property approximately 20½ months later.[40] The question, therefore, is how much more than $2 million was it worth? Petitioner argues that the exercise of the option was "very speculative" as of the valuation date and should be given no weight. We disagree.

The optionee was committed to pay $2 million for the easements alone (exclusive of the additional cost of the improvements), and we do not consider it unreasonable to conclude that the optionee would pay the extra $3 million (or less, when taking into account the improvement cost) to acquire the full bundle of the property rights included in the 31.47 acres of property group 5. This is especially true given that Santee was spearheading the development of the nearby property as a residential development, and the record leads to the conclusion that a hypothetical buyer and a hypothetical seller would both anticipate that the option was going to be exercised at the $5 million strike price.[41] To be

---

egress over the road across the Property shown on the approved tentative map for the Master Project * * * [and that] Optionor shall grant Optionee an easement over the land at the entrance of the Master Project, not to exceed one-half acre, in order to erect appropriate entry monumentation for the Master Project.

[40] We say "approximately" because the optionee also had to make certain improvements to the property in return for the easements.

[41] The fact that the parties to the option agreement expected the development to go through is also seen in part by observing that the option agreement provided that FDC would pay EFR $2 million for the easements after the first final subdivision map for the master project was approved.

sure, we doubt that sophisticated longtime businessmen such as the members of the Enniss family would encumber their property with the two-year option in return for a single dollar and the permanent easement sale for $2 million were they not confident that the option was likely to be exercised.

Mr. Eichel analyzed various similar properties and concluded that the fair market value of property group 5 was at least $5 million. Respondent invites the Court to set the applicable value at $5 million. We decline to do so. We believe that the $5 million option price is a reliable guide to the fair market value of property group 5 as of the exercise date but that the price must be adjusted to take into account the time value of money (also appreciation in property group 5) between August 12, 2004, and the valuation date. *See Estate of Trompeter v. Commissioner*, T.C. Memo. 1998–35; *Estate of Scanlan v. Commissioner*, T.C. Memo. 1996–331. Similar property in the area was appreciating at the rate of 1% per month, and we believe it appropriate to discount the $5 million option price by 20.5% to reflect (primarily but among other things) the passage of time from the valuation date to August 12, 2004.

While, theoretically speaking, the fair market value of property group 5 should also take into account the risk that the optionee would not have the funds to pay $5 million to exercise the option, the fact that Santee was pushing the development of the nearby property and that we apply the 1% rate for each of the 20½ months persuades us that this calculation best establishes the fair market value of property group 5 as of the valuation date. We hold that the applicable fair market value of property group 5 was $3,975,000 (i.e., $5 million $\times$ (1 - .205)).

5. *Bulk Sale Discount*

Mr. Holzhauer applied a bulk sale discount of 15% to the total value of the nine property groups. Petitioner argues that the discount is appropriate to reflect the fact that the nine groups of property are valued as if they were sold as of the same time. While petitioner calls this discount a "bulk discount", we understand petitioner to refer to a "market absorption" or "blockage" discount. *See Estate of Auker v. Commissioner*, T.C. Memo. 1998–185.

We agree with petitioner that a 15% discount is reasonable under the facts herein. Relevant evidence of value may include consideration of a market absorption discount in that such a discount reflects the fact that the sale of a large block of property in the same general location over a reasonable period of time usually depresses the price for that property. *See id.*; *see also Estate of Sturgis v. Commissioner*, T.C. Memo. 1987–415 (20% market absorption discount applied to 11,298.86 acres of undeveloped land); *Carr v. Commissioner*, T.C. Memo. 1985–19 (30% market absorption discount applied to 175 developed lots; no discount applied to 437.5 undeveloped lots); *Estate of Folks v. Commissioner*, T.C. Memo. 1982–43 (20% market absorption discount applied to five leased lumberyards with the same tenant and in the same geographical area); *Estate of Grootemaat v. Commissioner*, T.C. Memo. 1979–49 (15% market absorption discount applied to undeveloped lots totaling 302 acres). We believe that the sale of the nine property groups on or about the valuation date would depress the price for that property and, under the facts at hand, conclude that the 15% discount that petitioner requests is a reasonable measure of that depression.

## VII. *Insurance Premiums*

Respondent determined that petitioner failed to recognize insurance premium income of $128,584, $882, $299,178, and $298,000 received respectively in 2002, the one-day taxable year in 2003, the remaining taxable year in 2003, and 2004. Respondent determined these amounts on the basis of insurance revenues that petitioner reported on its Forms 990 for 2002 through 2004. Respondent continued to argue that these amounts were taxable as insurance premiums up until respondent's opening brief was filed. In that brief, respondent abandoned the characterization of the amounts as insurance premiums income, arguing instead that the amounts are rental income. Respondent asserts that the amounts petitioner reportedly received as insurance premiums were actually received as rent because the royalty rate set forth in the lease between EFR and Enniss, Inc., was not at fair market value. Respondent asserts that EFR could extract whatever amount of rent it deemed appropriate from

Enniss, Inc., during the subject years because EFR could change lease terms at its discretion and terminate at will the leasehold of Enniss, Inc.

Petitioner argues in its pretrial memorandum (and in its opening brief) that the disputed amounts do not reflect insurance premiums income because petitioner failed to provide insurance. Instead, petitioner argues, the amounts are nontaxable contributions to capital pursuant to *Carnation Co. v. Commissioner*, 640 F.2d 1010 (9th Cir. 1981) (holding that funds that a corporation received as insurance premiums were recharacterized as nontaxable contributions to capital because the corporation did not provide insurance), *aff'g* 71 T.C. 400 (1978). Petitioner argues in its answering brief that it is prejudiced by respondent's attempted recharacterization of the disputed amounts at this late stage of this proceeding because it never knew that it had to prove that the funds were not rent. Petitioner asserts that it would have developed and presented evidence at trial showing that the lease terms were at arm's length had it known that respondent was going to make the arguments that respondent now advances.

We agree with petitioner that respondent's new position is untimely. A party may not raise an issue for the first time on brief if the Court's consideration of the issue would surprise and prejudice the opposing party. *See Smalley v. Commissioner*, 116 T.C. 450, 456 (2001); *Seligman v. Commissioner*, 84 T.C. 191, 198–199 (1985), *aff'd*, 796 F.2d 116 (5th Cir. 1986). In deciding whether the opposing party will suffer prejudice, we consider the degree to which the opposing party is surprised by the new issue and the opposing party's need for additional evidence to respond to the new issue. *See Pagel, Inc. v. Commissioner*, 91 T.C. 200, 212 (1988), *aff'd*, 905 F.2d 1190 (8th Cir. 1990). In addition, a party may not rely upon a new theory unless the opposing party has been provided with fair warning of the intention to base an argument upon that theory. *See id.* at 211–212. "Fair warning" means that a party's ability to prepare its case was not prejudiced by the other party's failure to give notice, in the notice of deficiency or in the pleadings, of the intention to rely on a particular theory. *See id.*

We conclude that respondent's raising of the rental income issue in respondent's opening brief precluded or limited peti-

tioner's opportunity to present pertinent evidence and that petitioner would be significantly prejudiced if we decided that issue on the basis of the record at hand. Respondent had numerous opportunities to raise the new theory, and the failure to raise this issue when respondent could have done so waives the argument. *See Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975). We decline to consider it. Because petitioner did not provide insurance during the subject years, we conclude that the funds that it received as insurance premiums could not have been received as such but were instead received as contributions to its capital. *See Carnation Co. v. Commissioner*, 640 F.2d at 1013–1014.

The Court has considered all contentions, arguments, requests, and statements that the parties made and has rejected those not discussed here because they were without merit, moot, or irrelevant.

To reflect the foregoing,

*Decisions will be entered under Rule 155*.